ESTELLE, CORRECTIONS DIRECTOR *v.* SMITH

No. 79–1127.  Argued October 8, 1980—Decided May 18, 1981

Burger, C. J., delivered the opinion of the Court, in which Brennan, White, Blackmun, and Stevens, JJ., joined, and in all but Part II–C of which Marshall, J., joined. Brennan, J., filed a concurring statement, *post*, p. 474. Marshall, J., filed a statement concurring in part,

*post,* p. 474. STEWART, J., filed an opinion concurring in the judgment, in which POWELL, J., joined, *post,* p. 474. REHNQUIST, J., filed an opinion concurring in the judgment, *post,* p. 474.

*Anita Ashton,* Assistant Attorney General of Texas, argued the cause for petitioner. With her on the brief were *Mark White,* Attorney General, *John W. Fainter, Jr.,* First Assistant Attorney General, *Ted L. Hartley,* Executive Assistant Attorney General, and *W. Barton Boling* and *Douglas M. Becker,* Assistant Attorneys General.

*Joel Berger* argued the cause for respondent. With him on the brief were *John F. Simmons, Jack Greenberg, James M. Nabrit III, John Charles Boger,* and *Anthony G. Amsterdam.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to consider whether the prosecution's use of psychiatric testimony at the sentencing phase of respondent's capital murder trial to establish his future dangerousness violated his constitutional rights. 445 U. S. 926 (1980).

I

A

On December 28, 1973, respondent Ernest Benjamin Smith was indicted for murder arising from his participation in the armed robbery of a grocery store during which a clerk was fatally shot, not by Smith, but by his accomplice. In accordance with Art. 1257 (b)(2) of the Tex. Penal Code Ann. (Vernon 1974) concerning the punishment for murder with malice aforethought, the State of Texas announced its intention to seek the death penalty. Thereafter, a judge of the 195th Judicial District Court of Dallas County, Texas, informally ordered the State's attorney to arrange a psychiatric

*Joel I. Klein* filed a brief for the American Psychiatric Association as *amicus curiae* urging affirmance.

examination of Smith by Dr. James P. Grigson to determine Smith's competency to stand trial.[1]   See n. 5, *infra.*

Dr. Grigson, who interviewed Smith in jail for approximately 90 minutes, concluded that he was competent to stand trial.   In a letter to the trial judge, Dr. Grigson reported his findings: "[I]t is my opinion that Ernest Benjamin Smith, Jr., is aware of the difference between right and wrong and is able to aid an attorney in his defense."   App. A–6.   This letter was filed with the court's papers in the case.   Smith was then tried by a jury and convicted of murder.

In Texas, capital cases require bifurcated proceedings—a guilt phase and a penalty phase.[2]   If the defendant is found guilty, a separate proceeding before the same jury is held to fix the punishment.   At the penalty phase, if the jury affirmatively answers three questions on which the State has the

---

[1] This psychiatric evaluation was ordered even though defense counsel had not put into issue Smith's competency to stand trial or his sanity at the time of the offense.   The trial judge later explained: "In all cases where the State has sought the death penalty, I have ordered a mental evaluation of the defendant to determine his competency to stand trial. I have done this for my benefit because I do not intend to be a participant in a case where the defendant receives the death penalty and his mental competency remains in doubt."   App. A–117.   See Tex. Code Crim. Proc. Ann., Art. 46.02 (Vernon 1979).   No question as to the appropriateness of the trial judge's order for the examination has been raised by Smith.

[2] Article 37.071 (a) of the Tex. Code of Crim. Proc. Ann. (Vernon Supp. 1980) provides:

"Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment.   The proceeding shall be conducted in the trial court before the trial jury as soon as practicable.   In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence.   This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death."

burden of proof beyond a reasonable doubt, the judge must impose the death sentence. See Tex. Code Crim. Proc. Ann., Arts. 37.071 (c) and (e) (Vernon Supp. 1980). One of the three critical issues to be resolved by the jury is "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071 (b)(2).[3] In other words, the jury must assess the defendant's future dangerousness.

At the commencement of Smith's sentencing hearing, the State rested "[s]ubject to the right to reopen." App. A–11. Defense counsel called three lay witnesses: Smith's stepmother, his aunt, and the man who owned the gun Smith carried during the robbery. Smith's relatives testified as to his good reputation and character.[4] The owner of the pistol testified as to Smith's knowledge that it would not fire because of a mechanical defect. The State then called Dr. Grigson as a witness.

Defense counsel were aware from the trial court's file of the case that Dr. Grigson had submitted a psychiatric report in the form of a letter advising the court that Smith was competent to stand trial.[5] This report termed Smith "a severe

---

[3] The other two issues are "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" and "if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. Ann., Arts. 37.071 (b)(1) and (3) (Vernon Supp. 1980).

[4] It appears from the record that Smith's only prior criminal conviction was for the possession of marihuana. See App. A–64.

[5] Defense counsel discovered the letter at some time after jury selection began in the case on March 11, 1974. The trial judge later explained that Dr. Grigson was "appointed by oral communication," that "[a] letter of appointment was not prepared," and that "the court records do not reflect [the entry of] a written order." Id., at A–118. The judge also stated: "As best I recall, I informed John Simmons, the attorney for the defendant, that I had appointed Dr. Grigson to examine the defendant and

sociopath," but it contained no more specific reference to his future dangerousness. *Id.*, at A–6. Before trial, defense counsel had obtained an order requiring the State to disclose the witnesses it planned to use both at the guilt stage and, if known, at the penalty stage. Subsequently, the trial court had granted a defense motion to bar the testimony during the State's case in chief of any witness whose name did not appear on that list. Dr. Grigson's name was not on the witness list, and defense counsel objected when he was called to the stand at the penalty phase.

In a hearing outside the presence of the jury, Dr. Grigson stated: (a) that he had not obtained permission from Smith's attorneys to examine him; (b) that he had discussed his conclusions and diagnosis with the State's attorney; and (c) that the prosecutor had requested him to testify and had told him, approximately five days before the sentencing hearing began, that his testimony probably would be needed within the week. *Id.*, at A–14—A–16. The trial judge denied a defense motion to exclude Dr. Grigson's testimony on the ground that his name was not on the State's list of witnesses. Although no continuance was requested, the court then recessed for one hour following an acknowledgment by defense counsel that an hour was "all right." *Id.*, at A–17.

After detailing his professional qualifications by way of foundation, Dr. Grigson testified before the jury on direct examination: (a) that Smith "is a very severe sociopath"; (b) that "he will continue his previous behavior"; (c) that his sociopathic condition will "only get worse"; (d) that he has no "regard for another human being's property or for their life, regardless of who it may be"; (e) that "[t]here is

that a written report was to be mailed to me." *Ibid.* However, defense counsel assert that the discovery of Dr. Grigson's letter served as their first notice that he had examined Smith. *Id.*, at A–113, A–116.

On March 25, 1974, the day the trial began, defense counsel requested the issuance of a subpoena for the Dallas County Sheriff's records of Dr. Grigson's "visitation to . . . Smith." *Id.*, at A–8.

no treatment, no medicine . . . that in any way at all modifies or changes this behavior"; (f) that he "is going to go ahead and commit other similar or same criminal acts if given the opportunity to do so"; and (g) that he "has no remorse or sorrow for what he has done." *Id.*, at A-17—A-26. Dr. Grigson, whose testimony was based on information derived from his 90-minute "mental status examination" of Smith (*i. e.*, the examination ordered to determine Smith's competency to stand trial), was the State's only witness at the sentencing hearing.

The jury answered the three requisite questions in the affirmative, and, thus, under Texas law the death penalty for Smith was mandatory. The Texas Court of Criminal Appeals affirmed Smith's conviction and death sentence, *Smith* v. *State,* 540 S. W. 2d 693 (1976), and we denied certiorari, 430 U. S. 922 (1977).

## B

After unsuccessfully seeking a writ of habeas corpus in the Texas state courts, Smith petitioned for such relief in the United States District Court for the Northern District of Texas pursuant to 28 U. S. C. § 2254. The District Court vacated Smith's death sentence because it found constitutional error in the admission of Dr. Grigson's testimony at the penalty phase. 445 F. Supp. 647 (1977). The court based its holding on the failure to advise Smith of his right to remain silent at the pretrial psychiatric examination and the failure to notify defense counsel in advance of the penalty phase that Dr. Grigson would testify. The court concluded that the death penalty had been imposed on Smith in violation of his Fifth and Fourteenth Amendment rights to due process and freedom from compelled self-incrimination, his Sixth Amendment right to the effective assistance of counsel, and his Eighth Amendment right to present complete evidence of mitigating circumstances. *Id.*, at 664.

The United States Court of Appeals for the Fifth Circuit affirmed. 602 F. 2d 694 (1979). The court held that Smith's death sentence could not stand because the State's "surprise" use of Dr. Grigson as a witness, the consequences of which the court described as "devastating," denied Smith due process in that his attorneys were prevented from effectively challenging the psychiatric testimony. *Id.*, at 699. The court went on to hold that, under the Fifth and Sixth Amendments, "Texas may not use evidence based on a psychiatric examination of the defendant unless the defendant was warned, before the examination, that he had a right to remain silent; was allowed to terminate the examination when he wished; and was assisted by counsel in deciding whether to submit to the examination." *Id.*, at 709. Because Smith was not accorded these rights, his death sentence was set aside. While "leav[ing] to state authorities any questions that arise about the appropriate way to proceed when the state cannot legally execute a defendant whom it has sentenced to death," the court indicated that "the same testimony from Dr. Grigson, based on the same examination of Smith" could not be used against Smith at any future resentencing proceeding. *Id.*, at 703, n. 13, 709, n. 20.

## II

### A

Of the several constitutional issues addressed by the District Court and the Court of Appeals, we turn first to whether the admission of Dr. Grigson's testimony at the penalty phase violated respondent's Fifth Amendment privilege against compelled self-incrimination because respondent was not advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at a sentencing proceeding. Our initial inquiry must be whether the Fifth Amendment privilege is applicable in the circumstances of this case.

462

(1)

The State argues that respondent was not entitled to the protection of the Fifth Amendment because Dr. Grigson's testimony was used only to determine punishment after conviction, not to establish guilt. In the State's view, "incrimination is complete once guilt has been adjudicated," and, therefore, the Fifth Amendment privilege has no relevance to the penalty phase of a capital murder trial. Brief for Petitioner 33–34. We disagree.

The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." The essence of this basic constitutional principle is "the requirement that the State which proposes to convict *and punish* an individual produce the evidence against him by the independent labor of its officers, not by the simple, cruel expedient of forcing it from his own lips." *Culombe* v. *Connecticut,* 367 U. S. 568, 581–582 (1961) (opinion announcing the judgment) (emphasis added). See also *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964); E. Griswold, The Fifth Amendment Today 7 (1955).

The Court has held that "the availability of the [Fifth Amendment] privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *In re Gault,* 387 U. S. 1, 49 (1967). In this case, the ultimate penalty of death was a potential consequence of what respondent told the examining psychiatrist. Just as the Fifth Amendment prevents a criminal defendant from being made " 'the deluded instrument of his own conviction,' " *Culombe* v. *Connecticut. supra,* at 581, quoting 2 Hawkins, Pleas of the Crown 595 (8th ed. 1824), it protects him as well from being made the "deluded instrument" of his own execution.

We can discern no basis to distinguish between the guilt

and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned.[6] Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees. See *Green* v. *Georgia,* 442 U. S. 95, 97 (1979); *Presnell* v. *Georgia,* 439 U. S. 14, 16 (1978); *Gardner* v. *Florida,* 430 U. S. 349, 357–358 (1977) (plurality opinion). Any effort by the State to compel respondent to testify against his will at the sentencing hearing clearly would contravene the Fifth Amendment.[7] Yet the State's attempt to establish respondent's future dangerousness by relying on the unwarned statements he made to Dr. Grigson similarly infringes Fifth Amendment values.

(2)

The State also urges that the Fifth Amendment privilege is inapposite here because respondent's communications to Dr. Grigson were nontestimonial in nature. The State seeks support from our cases holding that the Fifth Amendment is not violated where the evidence given by a defendant is neither related to some communicative act nor used for the testimonial content of what was said. See, *e. g., United States* v. *Dionisio,* 410 U. S. 1 (1973) (voice exemplar); *Gilbert* v. *California,* 388 U. S. 263 (1967) (handwriting exemplar); *United States* v. *Wade,* 388 U. S. 218 (1967) (lineup); *Schmerber* v. *California,* 384 U. S. 757 (1966) (blood sample).

---

[6] Texas law does provide that "[n]o statement made by the defendant during the examination or hearing on his competency to stand trial may be admitted in evidence against the defendant *on the issue of guilt* in any criminal proceeding." Tex. Code Crim. Proc. Ann., Art. 46.023 (g) (Vernon 1979) (emphasis added). See also 18 U. S. C. § 4244; Fed. Rule Crim. Proc. 12.2 (c); *United States* v. *Alvarez,* 519 F. 2d 1036, 1042–1044 (CA3 1975); Note, Requiring a Criminal Defendant to Submit to a Government Psychiatric Examination: An Invasion of the Privilege Against Self-Incrimination, 83 Harv. L. Rev. 648, 649, and cases cited at nn. 8–9 (1969).

[7] The State conceded this at oral argument. Tr. of Oral Arg. 47, 49.

However, Dr. Grigson's diagnosis, as detailed in his testimony, was not based simply on his observation of respondent. Rather, Dr. Grigson drew his conclusions largely from respondent's account of the crime during their interview, and he placed particular emphasis on what he considered to be respondent's lack of remorse. See App. A–27—A–29, A–33—A–34.[8] Dr. Grigson's prognosis as to future dangerousness rested on statements respondent made, and remarks he omitted, in reciting the details of the crime.[9] The Fifth

---

[8] Although the Court of Appeals doubted the applicability of the Fifth Amendment if Dr. Grigson's diagnosis had been founded only on respondent's mannerisms, facial expressions, attention span, or speech patterns, 602 F. 2d 694, 704 (CA5 1979), the record in this case sheds no light on whether such factors alone would enable a psychiatrist to predict future dangerousness. The American Psychiatric Association suggests, however, that "absent a defendant's willingness to cooperate as to the verbal *content* of his communications, . . . a psychiatric examination in these circumstances would be meaningless." Brief for American Psychiatric Association as *Amicus Curiae* 26 (emphasis in original).

[9] On cross-examination, Dr. Grigson acknowledged that his findings were based on his "discussion" with respondent, App. A–32, and he replied to the question "[w]hat . . . was the most important thing that . . . caused you to think that [respondent] is a severe sociopath" as follows:

"He told me that this man named Moon looked as though he was going to reach for a gun, and he pointed his gun toward Mr. Moon's head, pulled the trigger, and it clicked—misfired, at which time he hollered at Howie, apparently his other partner there who had a gun, 'Watch out, Howie. He's got a gun.' Or something of that sort. At which point he told me—now, I don't know who shot this man, but he told me that Howie shot him, but then he walked around over this man who had been shot—didn't . . . check to see if he had a gun nor did he check to see if the man was alive or dead. Didn't call an ambulance, but simply found the gun further up underneath the counter and took the gun and the money. This is a very—sort of cold-blooded disregard for another human being's life. I think that his telling me this story and not saying, you know, 'Man, I would do anything to have that man back alive. I wish I hadn't just stepped over the body.' Or you know, 'I wish I had checked to see if he was all right' would indicate a concern, guilt, or remorse. But I didn't get any of this." *Id.*, at A–27—A–28.

Amendment privilege, therefore, is directly involved here because the State used as evidence against respondent the substance of his disclosures during the pretrial psychiatric examination.

The fact that respondent's statements were uttered in the context of a psychiatric examination does not automatically remove them from the reach of the Fifth Amendment. See n. 6, *supra.* The state trial judge, *sua sponte,* ordered a psychiatric evaluation of respondent for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent. Consequently, the interview with Dr. Grigson cannot be characterized as a routine competency examination restricted to ensuring that respondent understood the charges against him and was capable of assisting in his defense. Indeed, if the application of Dr. Grigson's findings had been confined to serving that function, no Fifth Amendment issue would have arisen.

Nor was the interview analogous to a sanity examination occasioned by a defendant's plea of not guilty by reason of insanity at the time of his offense. When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circumstances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist. See, *e. g., United States* v. *Cohen,* 530 F. 2d 43, 47–48 (CA5), cert. denied, 429 U. S. 855 (1976); *Karstetter* v. *Cardwell,* 526 F. 2d 1144, 1145 (CA9 1975); *United States* v. *Bohle,* 445 F. 2d 54, 66–67 (CA7 1971); *United States* v. *Weiser,* 428 F. 2d 932, 936 (CA2 1969), cert. denied, 402 U. S. 949 (1971); *United States* v. *Albright,* 388 F. 2d 719, 724–725 (CA4 1968); *Pope* v.

*United States,* 372 F. 2d 710, 720–721 (CA8 1967) (en banc), vacated and remanded on other grounds, 392 U. S. 651 (1968).[10]

Respondent, however, introduced no psychiatric evidence, nor had he indicated that he might do so. Instead, the State offered information obtained from the court-ordered competency examination as affirmative evidence to persuade the jury to return a sentence of death. Respondent's future dangerousness was a critical issue at the sentencing hearing, and one on which the State had the burden of proof beyond a reasonable doubt. See Tex. Code Crim. Proc. Ann., Arts. 37.071 (b) and (c) (Vernon Supp. 1980). To meet its burden, the State used respondent's own statements, unwittingly made without an awareness that he was assisting the State's efforts to obtain the death penalty. In these distinct circumstances, the Court of Appeals correctly concluded that the Fifth Amendment privilege was implicated.

### (3)

In *Miranda* v. *Arizona,* 384 U. S. 436, 467 (1966), the Court acknowledged that "the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda* held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.,* at 444. Thus, absent other fully effective procedures,

---

[10] On the same theory, the Court of Appeals here carefully left open "the possibility that a defendant who wishes to use psychiatric evidence in his own behalf [on the issue of future dangerousness] can be precluded from using it unless he is [also] willing to be examined by a psychiatrist nominated by the state." 602 F. 2d, at 705.

a person in custody must receive certain warnings before any official interrogation, including that he has a "right to remain silent" and that "anything said can and will be used against the individual in court." *Id.*, at 467–469. The purpose of these admonitions is to combat what the Court saw as "inherently compelling pressures" at work on the person and to provide him with an awareness of the Fifth Amendment privilege and the consequences of forgoing it, which is the prerequisite for "an intelligent decision as to its exercise." *Ibid.*

The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. Respondent was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting. During the psychiatric evaluation, respondent assuredly was "faced with a phase of the adversary system" and was "not in the presence of [a] perso[n] acting solely in his interest." *Id.*, at 469. Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death. He was not informed that, accordingly, he had a constitutional right not to answer the questions put to him.

The Fifth Amendment privilege is "as broad as the mischief against which it seeks to guard," *Counselman* v. *Hitchcock*,

142 U. S. 547, 562 (1892), and the privilege is fulfilled only when a criminal defendant is guaranteed the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." [11] *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964). We agree with the Court of Appeals that respondent's Fifth Amendment rights were violated by the admission of Dr. Grigson's testimony at the penalty phase.[12]

A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness. If, upon being adequately warned, respondent had indicated that he would not answer Dr. Grigson's questions, the validly ordered competency examination nevertheless could have proceeded upon the condition that the results would be applied solely for that purpose. In such circumstances, the proper conduct and use of competency and sanity examinations are not frustrated,

---

[11] While recognizing that attempts to coerce a defendant to submit to psychiatric inquiry on his future dangerousness might include the penalty of prosecutorial comment on his refusal to be examined, the Court of Appeals noted that making such a remark and allowing the jury to draw its own conclusions "might clash with [this Court's] insistence that capital sentencing procedures be unusually reliable." 602 F. 2d, at 707. See also *Griffin* v. *California*, 380 U. S. 609 (1965).

[12] For the reasons stated by the Court of Appeals, we reject the State's argument that respondent waived his Fifth Amendment claim by failing to make a timely, specific objection to Dr. Grigson's testimony at trial. See 602 F. 2d, at 708, n. 19. In addition, we note that the State did not present the waiver argument in its petition for certiorari. See this Court's Rule 40 (1) (d) (2) (1970).

but the State must make its case on future dangerousness in some other way.

"Volunteered statements . . . are not barred by the Fifth Amendment," but under *Miranda* v. *Arizona, supra,* we must conclude that, when faced while in custody with a court-ordered psychiatric inquiry, respondent's statements to Dr. Grigson were not "given freely and voluntarily without any compelling influences" and, as such, could be used as the State did at the penalty phase only if respondent had been apprised of his rights and had knowingly decided to waive them. *Id.,* at 478. These safeguards of the Fifth Amendment privilege were not afforded respondent and, thus, his death sentence cannot stand.[13]

## B

When respondent was examined by Dr. Grigson, he already had been indicted and an attorney had been appointed to represent him. The Court of Appeals concluded that he had a Sixth Amendment right to the assistance of counsel before submitting to the pretrial psychiatric interview. 602 F. 2d, at 708–709. We agree.

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." The "vital" need for a lawyer's advice and aid during the pretrial phase was recognized by the Court nearly 50 years ago in *Powell* v. *Alabama,* 287 U. S. 45, 57, 71 (1932). Since then, we have held that the right to counsel granted by the Sixth Amendment means that a person is entitled to the help of a lawyer "at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal

---

[13] Of course, we do not hold that the same Fifth Amendment concerns are necessarily presented by all types of interviews and examinations that might be ordered or relied upon to inform a sentencing determination.

charge, preliminary hearing, indictment, information, or arraignment." *Kirby* v. *Illinois,* 406 U. S. 682, 688–689 (1972) (plurality opinion); *Moore* v. *Illinois,* 434 U. S. 220, 226–229 (1977). And in *United States* v. *Wade,* 388 U. S., at 226–227, the Court explained:

> "It is central to [the Sixth Amendment] principle that in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." (Footnote omitted.)

See *United States* v. *Henry,* 447 U. S. 264 (1980); *Massiah* v. *United States,* 377 U. S. 201 (1964). See also *White* v. *Maryland,* 373 U. S. 59 (1963); *Hamilton* v. *Alabama,* 368 U. S. 52 (1961).

Here, respondent's Sixth Amendment right to counsel clearly had attached when Dr. Grigson examined him at the Dallas County Jail,[14] and their interview proved to be a "critical stage" of the aggregate proceedings against respondent. See *Coleman* v. *Alabama,* 399 U. S. 1, 7–10 (1970) (plurality opinion); *Powell* v. *Alabama, supra,* at 57. De-

---

[14] Because psychiatric examinations of the type at issue here are conducted after adversary proceedings have been instituted, we are not concerned in this case with the limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in *Miranda* v. *Arizona,* 384 U. S. 436, 471–473 (1966). See *Edwards* v. *Arizona, post,* p. 477. Rather, the issue before us is whether a defendant's Sixth Amendment right to the assistance of counsel is abridged when the defendant is not given prior opportunity to consult with counsel about his participation in the psychiatric examination. But cf. n. 15, *infra.*

Respondent does not assert, and the Court of Appeals did not find, any constitutional right to have counsel actually present during the examination. In fact, the Court of Appeals recognized that "an attorney present during the psychiatric interview could contribute little and might seriously disrupt the examination." 602 F. 2d, at 708. Cf. *Thornton* v. *Corcoran,* 132 U. S. App. D. C. 232, 242, 248, 407 F. 2d 695, 705, 711 (1969) (opinion concurring in part and dissenting in part).

fense counsel, however, were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness,[15] and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed.

Because "[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege," the assertion of that right "often depends upon legal advice from someone who is trained and skilled in the subject matter." *Maness* v. *Meyers,* 419 U. S. 449, 466 (1975). As the Court of Appeals observed, the decision to be made regarding the proposed psychiatric evaluation is "literally a life or death matter" and is "difficult . . . even for an attorney" because it requires "a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing." 602 F. 2d, at 708. It follows logically from our precedents that a defendant should not be forced to resolve such an important issue without "the guiding hand of counsel." *Powell* v. *Alabama, supra,* at 69.

Therefore, in addition to Fifth Amendment considerations, the death penalty was improperly imposed on respondent because the psychiatric examination on which Dr. Grigson testified at the penalty phase proceeded in violation of respondent's Sixth Amendment right to the assistance of counsel.[16]

---

[15] It is not clear that defense counsel were even informed prior to the examination that Dr. Grigson had been appointed by the trial judge to determine respondent's competency to stand trial. See n. 5, *supra.*

[16] We do not hold that respondent was precluded from waiving this constitutional right. Waivers of the assistance of counsel, however, "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends . . . 'upon the particular facts and circumstances surround-

## C

Our holding based on the Fifth and Sixth Amendments will not prevent the State in capital cases from proving the defendant's future dangerousness as required by statute. A defendant may request or consent to a psychiatric examination concerning future dangerousness in the hope of escaping the death penalty. In addition, a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase. See n. 10, *supra*.

Moreover, under the Texas capital sentencing procedure, the inquiry necessary for the jury's resolution of the future dangerousness issue is in no sense confined to the province of psychiatric experts. Indeed, some in the psychiatric community are of the view that clinical predictions as to whether a person would or would not commit violent acts in the future are "fundamentally of very low reliability" and that psychiatrists possess no special qualifications for making such forecasts. See Report of the American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual 23–30, 33 (1974); A. Stone, Mental Health and Law: A System in Transition 27–36 (1975); Brief for American Psychiatric Association as *Amicus Curiae* 11–17.

In *Jurek* v. *Texas,* 428 U. S. 262 (1976), we held that the Texas capital sentencing statute is not unconstitutional on its face. As to the jury question on future dangerousness, the joint opinion announcing the judgment emphasized that a defendant is free to present whatever mitigating factors he may be able to show, *e. g.,* the range and severity of his past criminal conduct, his age, and the circumstances surrounding the crime for which he is being sentenced. *Id.,* at 272–273. The State, of course, can use the same type of evidence in seeking

---

ing [each] case . . . .' " *Edwards* v. *Arizona, post,* at 482, quoting *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938). No such waiver has been shown, or even alleged, here.

to establish a defendant's propensity to commit other violent acts.

In responding to the argument that foretelling future behavior is impossible, the joint opinion stated:

"[P]rediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice." *Id.,* at 275–276 (footnotes omitted).

While in no sense disapproving the use of psychiatric testimony bearing on the issue of future dangerousness, the holding in *Jurek* was guided by recognition that the inquiry mandated by Texas law does not require resort to medical experts.

### III

Respondent's Fifth and Sixth Amendment rights were abridged by the State's introduction of Dr. Grigson's testimony at the penalty phase, and, as the Court of Appeals concluded, his death sentence must be vacated.[17] Because respondent's underlying conviction has not been challenged and remains undisturbed, the State is free to conduct further pro-

_____

[17] Because of our disposition of respondent's Fifth and Sixth Amendment claims, we need not reach the question of whether the failure to give advance notice of Dr. Grigson's appearance as a witness for the State deprived respondent of due process.

ceedings not inconsistent with this opinion.   Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BRENNAN.

I join the Court's opinion.  I also adhere to my position that the death penalty is in all circumstances unconstitutional.

JUSTICE MARSHALL, concurring in part.

I join in all but Part II–C of the opinion of the Court.  I adhere to my consistent view that the death penalty is under all circumstances cruel and unusual punishment forbidden by the Eighth and Fourteenth Amendments.  I therefore am unable to join the suggestion in Part II–C that the penalty may ever be constitutionally imposed.

JUSTICE STEWART, with whom JUSTICE POWELL joins, concurring in the judgment.

The respondent had been indicted for murder and a lawyer had been appointed to represent him before he was examined by Dr. Grigson at the behest of the State.  Yet that examination took place without previous notice to the respondent's counsel.  The Sixth and Fourteenth Amendments as applied in such cases as *Massiah* v. *United States,* 377 U. S. 201, and *Brewer* v. *Williams,* 430 U. S. 387, made impermissible the introduction of Dr. Grigson's testimony against the respondent at any stage of his trial.

I would for this reason affirm the judgment before us without reaching the other issues discussed by the Court.

JUSTICE REHNQUIST, concurring in the judgment.

I concur in the judgment because, under *Massiah* v. *United States,* 377 U. S. 201 (1964), respondent's counsel should have been notified prior to Dr. Grigson's examination of respondent.  As the Court notes, *ante,* at 469, respondent had been indicted and an attorney had been appointed to represent

him. Counsel was entitled to be made aware of Dr. Grigson's activities involving his client and to advise and prepare his client accordingly. This is by no means to say that respondent had any right to have his counsel present at any examination. In this regard I join the Court's careful delimiting of the Sixth Amendment issue, *ante,* at 470, n. 14.

Since this is enough to decide the case, I would not go on to consider the Fifth Amendment issues and cannot subscribe to the Court's resolution of them. I am not convinced that any Fifth Amendment rights were implicated by Dr. Grigson's examination of respondent. Although the psychiatrist examined respondent prior to trial, he only testified concerning the examination after respondent stood convicted. As the court in *Hollis* v. *Smith,* 571 F. 2d 685, 690–691 (CA2 1978), analyzed the issue: "The psychiatrist's interrogation of [defendant] on subjects presenting no threat of disclosure of prosecutable crimes, in the belief that the substance of [defendant's] responses or the way in which he gave them might cast light on what manner of man he was, involved no 'compelled testimonial self-incrimination' even though the consequence might be more severe punishment."

Even if there are Fifth Amendment rights involved in this case, respondent never invoked these rights when confronted with Dr. Grigson's questions. The Fifth Amendment privilege against compulsory self-incrimination is not self-executing. "Although *Miranda*'s requirement of specific warnings creates a limited exception to the rule that the privilege must be claimed, the exception does not apply outside the context of the inherently coercive custodial interrogations for which it was designed." *Roberts* v. *United States,* 445 U. S. 552, 560 (1980). The *Miranda* requirements were certainly not designed by this Court with psychiatric examinations in mind. Respondent was simply not in the inherently coercive situation considered in *Miranda.* He had already been indicted, and counsel had been appointed to represent him. No claim is raised that respondent's answers to Dr. Grigson's questions

were "involuntary" in the normal sense of the word. Unlike the police officers in *Miranda,* Dr. Grigson was not questioning respondent in order to ascertain his guilt or innocence. Particularly since it is not necessary to decide this case, I would not extend the *Miranda* requirements to cover psychiatric examinations such as the one involved here.