UNITED STATES of America

v.

William E. ZUMBADO.

No. CR–86–AR–258–E.

United States District Court,
N.D. Alabama, E.D.

Dec. 30, 1986.

Frank W. Donaldson, U.S. Atty., Bill L. Barnett, Asst. U.S. Atty., for the U.S.

George C. Lucas, Birmingham, Ala., for William E. Zumbado.

## MEMORANDUM OPINION

ACKER, District Judge.

William E. Zumbado was found guilty by a jury on December 4, 1986, of possessing a firearm after having been convicted of a felony in violation of 18 U.S.C. App. § 1202(a)(1). Zumbado's sentencing hearing was originally scheduled for December 18, 1986, but on his motion the hearing was continued until December 29, 1986, after he refused to respond to the questions of the Probation Service while it was preparing the pre-sentence report. Zumbado's counsel requested time within which to research the question of whether or not an invocation of the Fifth Amendment privilege against self-incrimination by a defendant during the sentencing phase can be used against the defendant by the Government in its argument for imposition of a severe penalty, and by the court in assessing the penalty.

During trial, there were several people in the audience who, after the conviction, have expressed to the court orally and in writing their belief that Zumbado has recently had a conversion experience and has become a Christian since his incarceration. Some of these people assert that as a result of his conversion Zumbado no longer poses a threat to society. During allocution today Zumbado, in effect, concurred in what his new Christian friends say about him in this regard.

During today's hearing, Zumbado chose again to invoke his privilege against self-incrimination rather than to challenge or to openly discuss the purported facts contained in the pre-sentence report. The initial response of the Government was that Zumbado had no privilege against self-incrimination during the sentencing phase because he is immune from prosecution as to anything he communicates to the court, or to its probation officer. After a recess, during which the court and the attorney for the Government found *United States v. Rodriguez*, 498 F.2d 302 (5th Cir.1974), *Thomas v. United States*, 368 F.2d 941 (5th Cir.1966), and *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Government conceded that the full protection of the Fifth Amendment is available to a defendant even during the penalty phase. In Zumbado's case the material in the pre-sentence report stands uncontradicted as a result of Zumbado's election to invoke the Fifth Amendment, a right which defendant clearly still possesses. The question not answered unequivocally by the decided cases is whether or not the *mere fact* that a defendant declines to cooperate with the Probation Service can be

considered by the court in assessing the penalty.

Because the court has chosen to impose the maximum custodial sentence provided in the criminal statute here involved, and because Zumbado has already notified the court of his intent to appeal, the court reserved the right to write briefly an opinion elaborating its oral remarks.

If the court were not in any way influenced by Zumbado's invocation of the Fifth Amendment *per se*, there are abundant reasons reflected in the pre-sentence report, as well as in the conviction itself, for imposing the sentence which was imposed. The report demonstrates that Zumbado has an extensive criminal history, and the Probation Service's recommendation of the maximum custodial sentence was certainly justified without regard to Zumbado's non-cooperation. The question as to whether there is any limitation, except the maximum penalty provided by statute, as to what a trial judge can consider in deciding upon the appropriate penalty is a question which perhaps should be addressed. It would be easy for this court to disclaim any reliance whatsoever upon Zumbado's exercise of his Fifth Amendment privilege so as to obviate the present inquiry and to render the entire issue moot. However, this case is clearly distinguishable from *Thomas v. United States*, in which the Fifth Circuit held that the trial court abused its discretion by threatening the defendant with a more severe sentence if he did not "come clean and admit his guilt." In Zumbado's case the court did not in any way threaten Zumbado or attempt to induce him to waive his Fifth Amendment privilege. Yet, the mere fact that he invoked that privilege and refused to discuss his background, either personal or criminal, with the Probation Service or with the court, was a factor, however slight, in the court's sentencing decision, and the court willingly makes this a matter of record. The court would in all likelihood have imposed a two-year custodial sentence without regard to Zumbado's non-cooperation, but the court admits to having fed Zumbado's non-cooperation (or invocation of the Fifth Amendment) into the sentencing equation.

■ If there is any limitation upon the range of factors which a trial judge can consider in the penalty phase, it would seem that the religion or non-religion of the defendant is something which cannot or should not be considered. The First Amendment, as construed by the Supreme Court, precludes any pernicious entanglement between government and religion in any form or shape. If a school teacher cannot invoke God in the classroom, how can God be invoked in the courtroom? And yet, admittedly, this court is opened every day with the words, "God save the United States and this Honorable Court." A defendant doesn't realize that this intonement is no more than a quaint piece of nostalgia, an innocuous vestige from a bygone era when there was an official acknowledgement of the existence of God. Without such an understanding, when a defendant hears these words it is no wonder that he is tempted to invoke the God he heard formally invoked by the court, and he even may be tempted to invoke the particular brand of religion or the kind of God personally espoused by the sentencing judge, that is, if the sentencing judge espouses any. Put another way, should the severity or leniency of a sentence be influenced either by the judge's religious preferences or by a profession of faith by the person who stands before him convicted? Predictably there may be disparity in the sentences imposed if the trial court's discretion can be based in any degree upon his own religion or upon the religion of the defendant, so not only is the constitutional mandate of separation of church from state possibly implicated here, but the equal protection clause of the Fifth Amendment may also be implicated. For instance, what would be the reaction of a Jewish judge or an atheist judge or a Muslim judge to the communications which this court has been receiving on behalf of Zumbado? Is it fair, or right, or constitutional, for a judge who happens to be a professing Christian to permit himself to be influenced in sentencing by his own theology or the theology of the defendant,

whether the theologies are the same or different? Of course, it is extremely difficult to separate the human mind into compartments, even the judicial mind, and it is impossible, as a practical matter, to say with confidence what influences or fails to influence any particular mental operation including that of this court.

Perhaps under the Comprehensive Crime Control Act and its prospective sentencing criteria, which will supposedly become effective on November 1, 1987, federal judges will be sufficiently relieved of sentencing discretion so that they will not be tempted to accept or to reject or to be influenced by a defendant's claim that he has been converted. That, however, takes place on November 1, 1987, if the criteria can be agreed upon within the mandated time period, and this is December 29, 1986.

■ Because this court has decided that it cannot consider any religious factor in sentencing, the court does not have to decide upon the validity or the *bona fides* of Zumbado's conversion experience or its long-term effect on Zumbado's relationships with his fellow human beings.

As dictum the court refers to a book alleged to describe historical events. It is sometimes called The Bible. It tells of a man named Saul who had a conversion experience on the road to Damascus. More than one federal judge could say with some authority that more people claim a conversion experience on the road to the Big House than on the road to Damascus. Such a cynical comment is uncalled for when no inquiry into "conversion" is permitted. The court will point out, however, that this history book further maintains that Saul, as Paul, was quite a successful Christian while in jail, perhaps more successful than while he was free.

On the basis of the materials presented at the pre-sentence hearing this date and on the basis of this opinion, the sentence imposed by the court is RATIFIED and CONFIRMED in all respects.