[Cite as *State v. Harris*, 2013-Ohio-349.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-110472 |
| | | TRIAL NO. B-1006801-A |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| JOSEPH HARRIS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: February 6, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Law Office of Wendy R. Calaway, Co., LPA*, and *Wendy R. Calaway,* for Defendant-Appellant.

Please note: this case has been removed from the accelerated calendar.

Per Curiam.

{¶1}    Joseph Harris appeals his convictions for aggravated murder with a firearm specification, aggravated robbery, and having a weapon while under a disability.  Because we conclude that the trial court erred when it allowed the testimony of a court psychologist during the state's case in chief, we reverse the judgment of the trial court, and remand the cause for a new trial.

{¶2}    Harris, and his codefendant, Ryan Bennie, were indicted for aggravated murder with firearm specifications, murder with firearm specifications, aggravated robbery with firearm specifications, and having weapons while under disability for a shooting that resulted in the death of Shane Gulleman in the Winton Terrace neighborhood of Cincinnati on September 26, 2010.

### Pretrial Issues

{¶3}    During discovery, the state filed a certification in support of its motion for nondisclosure of the state's private witnesses.  *See* Crim.R. 16(D).  Pursuant to Rule 7(K) of the Hamilton County Rules of Practice of the Court of Common Pleas, a hearing was held before the presiding criminal judge of the court of common pleas on May 4, 2011.[1]  Upon the motion of the assistant prosecutor and over the objections of the codefendants' attorneys, the presiding judge excluded the defense attorneys from his chambers while the assistant prosecutor presented his evidence in support of nondisclosure.  At the conclusion of the hearing, the presiding judge found that the assistant prosecutor had not abused his discretion when he did not disclose the witnesses to the defendants.

---

[1] Rule 7(K) requires that the presiding criminal judge hold the nondisclosure hearing.

{¶4}    On May 18, 2011, the assistant prosecutor moved to take a deposition of Sherron Peoples to perpetuate his testimony.  The state asserted that Peoples, who was one of the witnesses whose name had not been disclosed to defense attorneys, was a threat not to appear at trial.  Following a hearing, the presiding judge granted the state's motion.  On May 19, 2011, the state and defense attorneys conducted a deposition of Peoples with both defendants present.

### Jury Trial

{¶5}    Harris and Bennie were tried before a jury.  Gulleman was 18 years old when he drove from Indiana to Winton Terrace for the purpose of buying Oxycontin from Harris.  Gulleman parked his car in a lot.  He was then shot seven to eight times.  He died at the scene.  Gulleman's mother, Jamie Gulleman, testified that her son had had a drug problem, and that she had identified him from a photograph shown to her by police officers.

{¶6}    Khristina Willis testified that she had lived in Winton Terrace in February 2010.  Willis stated that on the night of September 25, 2010, she had been walking to a store in the neighborhood and had seen Harris pull out a gun and ask a group of people "where the money and weed at."  According to Willis, she knew Harris through his mother.  Willis stated that she believed that Harris and another black male had been committing a robbery.  After seeing Harris pull out a gun, Willis had run down the street to her neighbor's house.  As Willis was running to her neighbor's house, she had seen Harris and the other man going toward a street known as "Long Craft."  Willis estimated that she had been at her neighbor's house for approximately ten minutes when she heard shots ring out from the direction where Harris had been headed.  Willis then had seen Harris and another man jumping a fence near a parking lot.

{¶7}   Police officer Benjamin Miller testified that in the early morning hours of September 26, 2010, he had gone to a parking lot behind a building at 112 Craft Street in Cincinnati in response to a report of shots having been fired. Miller testified that 112 Craft Street was on the portion of street commonly referred to in the neighborhood as "Long Craft." According to Miller, when he and his partner responded to the parking lot, they had found a gunshot victim slumped over in the driver seat of a white, four-door sedan. Miller testified that the victim was unresponsive, and that he and his partner had called for paramedics at that time. Miller remained at the scene to ensure that no one disturbed the crime scene.

{¶8}   Dr. William Ralston, chief deputy coroner for Hamilton County, testified about the autopsy that he performed on Gulleman. Ralston stated that Gulleman had been shot eight or nine times and that all of the bullets had traveled from right to left. Ralston stated that the results of the autopsy were consistent with the bullets having been fired from the passenger side of the car.

{¶9}   The state next called Sherron Peoples to testify. Peoples stated that he knew both Harris and Bennie, and that he had known Harris all his life. On the night of the shooting, Peoples was in a car in the same parking lot where Gulleman was shot. Peoples testified that he had seen Gulleman pull into the parking lot in a white car. After Gulleman had parked his car, Peoples had seen Harris and Bennie walk into the parking lot and go toward Gulleman's car. During his trial testimony, Peoples stated that he did not know who had gotten into the car. But he conceded at trial that he may have told police that he had seen Harris get in the car, and that he had heard gunshots. After hearing the gunshots, Peoples had seen Harris and Bennie leaving the parking lot. Peoples stated that he may have told police officers

that he had seen a gun in Harris's hand, and that he had known Harris to carry a .45-caliber gun.

{¶10} Police officer David Landesberg identified photographs that he had taken at the scene of the shooting. According to Landesberg, police officers had recovered $210 that had been found under Gulleman's left leg. Landesberg also testified that a pellet gun had been found under the passenger seat of Gulleman's car. When asked about the gun by Harris's counsel, Landesburg stated that it looked like a real firearm, and that it had been completely concealed under the passenger seat.

{¶11} Police sergeant Jeff Hunt testified that he had been dispatched to arrest Harris for suspicion of Gulleman's murder. Hunt stated that Harris's cellular telephone had been recovered from one of his pockets and that a bag of bullets had been recovered from the apartment where Harris had been found. According to Hunt, the bullets in the bag appeared to be .45-caliber bullets.

{¶12} Over the objection of defense counsel, Dr. Carla Dreyer, a psychologist, testified that Harris had been referred to the court clinic by the trial court for an evaluation of his competency to stand trial and for a determination of whether he had been legally insane at the time of the shooting. Dreyer testified that Harris was competent to stand trial and that he did not meet the criteria for a not-guilty-by-reason-of-insanity plea. Dreyer testified that in her opinion, Harris "was malingering both cognitive and psychiatric difficulties." Dreyer explained that malingering meant "feigning or exaggerating, so basically making up or exaggerating already existing symptoms to seem worse than they are."

{¶13} Gary Brown testified that he had been in the Hamilton County Justice Center while Harris and Bennie were held there. According to Brown, Harris had told him that "[Gulleman] had that roll on him and he act like he didn't want to give

it up." Brown stated that, to him, that meant, "like if someone is robbing you, you hesitating to, you know, give up what they ask for." Brown testified that Harris had stated that a woman had "rolled over on him," and that Harris had said he would "blam" her. The assistant prosecutor then asked, "Did [Harris] make any statement about what he had done to the guy that wouldn't give him the roll?" And Brown replied, "He said he blammed him, but he didn't go off into detail about where he shot him at or what he shot him with, or --- he didn't go on off into that. But blam, blam basically means shoot, shoot someone."

{¶14} Tobias Johnson and Harris were housed in the same pod in the justice center. Johnson testified that Harris had discussed his case with him and had told Johnson that he planned to act like he was crazy to try to avoid the charges against him. According to Johnson, Harris had told him two versions of what had happened the night that Gulleman was shot. In the first story, Harris stated that another person, who went by the nickname "B," was going to sell Gulleman some heroin. B had run out of heroin, so Harris had lied and said he had Oxycontin and arranged to meet Gulleman. According to Johnson, Harris had gone to the parking lot to rob Gulleman. Johnson stated that Harris had told him that when he had pointed a gun at Gulleman, Gulleman had begun to cry and had said that he had planned on robbing Harris. Harris had then gotten out of the car and shot Gulleman as Harris was exiting from the car. In the second version of the story that Harris allegedly told Johnson, Harris had gone to the parking lot to rob Gulleman. There was no mention of Gulleman having stated that he had also planned to rob Harris.

{¶15} Antonio Gray had also met Harris in the justice center. According to Gray, Harris had told him that he was going to plead insanity first, and if that did not work, he was going to say that he had not been there when the shooting happened.

Gray also testified that Harris had told him about the shooting: "And it was supposed to be, you know I guess a robbery because he was supposed to have 85 Oxycontin pills, Mr. Harris did, and he was going to rob, you know Mr. Gulleman. But it did not go as planned because Mr. Gulleman didn't want to give up the money." According to Gray, Harris told him that because Gulleman had not given him the money, Harris had shot him.

{¶16} Derrell Anderson testified that he had met Harris in the justice center. According to Anderson, Harris had told him "that a murder happened in the first right court on Craft Street, that he was robbing the guy. It was the guy that came down there to meet somebody else for some drugs. And he went and instead of giving him the drugs he robbed the guy."

{¶17} Harris took the stand in his own defense. Harris testified that on September 25, he had gone to the parking lot to sell Gulleman some Oxycontin. According to Harris, Gulleman had started to hesitate before paying for the pills. Harris testified that

> [Gulleman] said something, he left something in the back. So I am like—I am already watching it, because I know how a lick will do as you pull off or they'll either come and rob a person late night or do anything, so I am already like watching him, what he's doing. So I am looking back. The whole time his body is turned towards the back seat and he was doing something under the seat, so I looked back. I'm like, what you doing, man? He just kept hesitating and trying to take my attention off of him giving me the money, because I had the pills already to sell him. So I look back and I see what he was grabbing, and I just—I got out. I ran, I started shooting.

Harris claimed that he had seen what he believed to be a real gun in Gulleman's backseat.

{¶18} At the conclusion of the trial, the jury found Harris guilty as charged.[2] Following a sentencing hearing, the trial court merged the murder count with the aggravated murder count and sentenced Harris to life without the possibility of parole for aggravated murder, with a consecutive three-year term for the firearm specification, eight years for aggravated robbery, and five years for having a weapon while under a disability. The sentences were made consecutive to each other for an aggregate sentence of life plus 16 years.

### Harris's Appeal

{¶19} In his first assignment of error, Harris asserts that the trial court erred by allowing the state to introduce evidence of his court-ordered competency evaluation. Harris contends that the admission of the evidence, including statements that he made to Dreyer, violated his Fifth Amendment protection against self-incrimination, his Sixth Amendment right to counsel, and his Fourteenth Amendment right to a fair trial and due process. We consider each of these contentions in turn.

{¶20} Harris points to the United States Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), to support his claims that the admission of Dreyer's testimony violated his Fifth and Sixth Amendment rights. In *Estelle*, the trial court ordered the defendant in a capital murder case to undergo a psychiatric evaluation, even though defense counsel had not raised the defendant's competency or sanity. *Id.* at 456-457. The psychiatrist concluded that the defendant was competent to stand trial. *Id.* at 457. Then, in the penalty phase,

---

[2] Bennie was acquitted of all charges.

the state called the psychiatrist to testify about the defendant's lack of remorse and future dangerousness. *Id.* at 458. In the course of his testimony, the psychiatrist related statements that the defendant had made about the crime itself. *Id.* at 464. The Supreme Court concluded that the examination that formed the basis of the psychiatrist's testimony violated the defendant's Fifth Amendment right against self-incrimination because the defendant had been compelled to speak to the psychiatrist and had not been informed of his *Miranda* rights. *Id.* at 469. Similarly, the court held that the psychiatrist's examination violated the defendant's right to counsel because the defendant was "denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Id.* at 471.

{¶21} *Estelle* is inapposite. Unlike the defendant in *Estelle*, Harris voluntarily submitted to the psychiatrist's examination when his counsel submitted a suggestion of incompetence and a written not-guilty-by-reason-of-insanity plea. "[T]he appellant, by entering his plea of not guilty by reason of insanity, initiated the interview process set forth in R.C. 2945.39, and * * * under the rationale of *Steffen, supra,* he cannot complain about the use of the results obtained from it." *State v. Price*, 1st Dist. Nos. C-860402 and C-860409, 1987 Ohio App. LEXIS 9310 (Oct. 28, 1987), citing *State v. Steffen*, 31 Ohio St.3d 111, 121-22, 509 N.E.2d 383 (1987). We thus conclude that Harris's Fifth and Sixth Amendment rights were not violated.

{¶22} Harris also argues that Dreyer's testimony violated his right to a fair trial and his due-process rights. He contends that the trial court allowed the testimony in violation of Evid.R. 404.

{¶23} The state argued at trial, and argues now on appeal, that Dreyer's testimony about Harris's malingering, in conjunction with the testimony that Harris

intended to feign mental illness, was admissible as evidence of consciousness of guilt. In *State v. Eaton*, the Ohio Supreme Court stated "flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself." 19 Ohio St.2d 145, 160, 249 N.E.2d 897 (1969), *vacated on other grounds* 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 750 (1972), quoting 2 Wigmore, *Evidence* 111, Section 276 (3 Ed.). But under R.C. 2945.371(J), "[n]o statement that a defendant makes in an evaluation or hearing under divisions (A) to (H) of this section relating to the defendant's competence to stand trial or to the defendant's mental condition at the time of the offense charged shall be used against the defendant on the issue of guilt in any criminal action or proceeding * * *." Thus, we conclude that Dreyer's testimony about Harris's malingering was not admissible as evidence of his consciousness of guilt.

{¶24} Courts have recognized that testimony about a defendant's statements during a competency examination could be admitted for reasons other than evidence of guilt. "A defendant's statements made in the course of a court-ordered psychological examination may be used to refute his assertion of mental incapacity, but may not be used to show that he committed the acts constituting the offense." *State v. Cooey*, 46 Ohio St.3d 20, 544 N.E.2d 895 (1989), paragraph two of the syllabus. *See* Evid.R. 404(A)(1). But in this case, Dreyer's testimony was offered in the state's case in chief, not in rebuttal.

{¶25} We therefore conclude that the trial court erred when it allowed Dreyer to testify. The state argues that, even if we did conclude that the testimony was improper, any error would be harmless, as Harris took the stand in his own

defense and admitted that he had shot Gulleman. We turn our consideration, then, to whether the admission of the testimony was harmless.

{¶26}  "Before constitutional error can be considered harmless, we must be able to 'declare a belief that it was harmless beyond a reasonable doubt.' * * * Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." (Citations omitted.)  *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992). *See* Crim.R. 52(A).  Here, we cannot conclude that the court's error was harmless beyond a reasonable doubt.  Dreyer's testimony was initially offered to bolster the state's claim that Harris had intended to feign mental illness to avoid the charges against him.  The testimony about Harris's alleged malingering lended credibility to the testimony of Brown, Johnson, Anderson, and Gray about Harris's statements in the justice center.  Until he testified, Harris's defense appeared to be centered around the argument that he had not been involved.  But once he took the stand, his defense shifted to whether the shooting had been done in the course of committing a robbery.  If there were no attempted robbery, Harris could not be guilty of aggravated murder.

{¶27}  We agree that, given Harris's testimony, Dreyer's testimony may have been harmless if it went only to whether Harris had shot Gulleman.  But because the testimony was about Harris feigning symptoms, it emphasized Harris's questionable credibility.  Such questions about his credibility could have reasonably affected how the jury viewed Harris's explanation of the shooting and his contention that he had not intended to rob Gulleman.  We conclude that the error was not harmless, and we sustain the first assignment of error.  We therefore reverse Harris's convictions for aggravated murder and aggravated robbery.

{¶28}   In his second assignment of error, Harris asserts that the trial court erred when it failed to grant his motion to compel discovery.  During discovery, the assistant prosecutor filed a certificate of nondisclosure of witnesses pursuant to Crim.R. 16(D).  In accordance with Rule 7(K) of the Hamilton County Rules of Practice of the Court of Common Pleas, the matter was referred to the presiding judge for a review of the prosecuting attorney's certification. *See* Crim.R. 16(F).

{¶29}   During the hearing before the presiding judge, the assistant prosecutor requested that he be permitted to present information in support of his certification of nondisclosure outside the presence of the defense attorneys.  The defense attorneys objected, arguing that an ex parte hearing would impinge upon the effectiveness of their assistance to their clients.  Over defense objections, the presiding judge conducted the hearing outside the presence of defense counsel.  Before the defense attorneys left the presiding judge's chambers, Harris's attorney asked the assistant prosecutor if there had been direct threats to the witnesses whose names were not being disclosed.  The prosecutor replied, "[I]n general, the witnesses who the state anticipating [sic] calling in this case have all expressed—made a request on their own to law enforcement, either to me or to the police, that their names and identities not be disclosed prior to trial because of a concern for their safety.  With respect to any direct threats, that is information that I want to give the court outside the presence of counsel."

{¶30}   After defense counsel left the chambers, the assistant prosecutor presented information about threats to and concerns for the safety of four state witnesses.  Four police officers, who also attended the hearing, attested to the information relayed by the assistant prosecutor.  Part of the information relayed to the court included an allegation that after the assistant prosecutor had disclosed to

Harris's prior counsel that one of the witnesses, Sherron People, was a confidential informant, the witness had been approached on the street and threatened. According to the assistant prosecutor, that incident was the instigation for requesting an ex parte hearing with the presiding judge. The presiding judge concluded that the assistant prosecutor had not abused his discretion in refusing to disclose the name of the four witnesses.

{¶31} Harris now contends that the assistant prosecutor's certificate of non-disclosure failed to provide any reasonable, articulable facts in support of non-disclosure as required by Crim.R. 16(D). But we conclude that the certification satisfied the rule's requirements.

{¶32} More troubling is the hearing that took place before the presiding judge. Crim.R. 16(F) provides that "[u]pon motion of the defendant, the trial court shall review the prosecuting attorney's decision of nondisclosure * * * for abuse of discretion during an *in camera* hearing conducted seven days prior to trial, with counsel participating." Clearly, the presiding judge's decision to allow the prosecutor to present information during an ex parte hearing violated the rule's requirement that a hearing be conducted with counsel participating.

{¶33} Having concluded that the presiding judge erred in holding an ex parte hearing, we must consider whether Harris was prejudiced by the error. We conclude that he has not demonstrated prejudice. It is clear that the prosecutor did disclose the names of the four witnesses to defense counsel. Despite Harris's assertions, there is no indication how earlier disclosure of the names of the witnesses would have aided his defense. The hearing before the presiding judge occurred on May 4, 2011, which was seven days before the scheduled trial date. On May 19, 2011, the prosecutor and the defense attorneys again appeared before the presiding judge

13

on the prosecutor's request to perpetuate the testimony of Peoples. The presiding judge granted the prosecutor's request, and Peoples was deposed with all attorneys and Harris and Bennie attending. The trial did not begin until June 15, so it is unclear how, given the length of time between the disclosure of Peoples's name and the start of trial, Harris's counsel was prevented from adequately preparing for trial. And while the other three witnesses were presumably not disclosed until the start of the trial, Harris has provided no demonstration of how his counsel was prevented from preparing for trial.

{¶34} Nor has Harris demonstrated how he was prejudiced by the non-disclosure of the witnesses. Harris did not ask for a continuance when the names were disclosed. Further, he did not object to the testimony of any of the witnesses when they were called to testify. Thus, while we are troubled by the violation of Crim.R. 16(F), we overrule Harris's assignment of error because he has not demonstrated prejudice.

{¶35} Harris's third assignment of error is that he was deprived of a fair trial and due process of law by the misconduct of the prosecutor. His fourth assignment of error is that he was deprived of the effective assistance of counsel. And his sixth assignment of error is that he was deprived of a fair trial due to cumulative error. Given our disposition of the first assignment of error, these assignments of error are moot, and we decline to address them.

{¶36} The fifth assignment of error is that his convictions were based on insufficient evidence and were against the manifest weight of the evidence. Harris also asserts that the trial court erred when it denied his Crim.R. 29 motion for an acquittal.

14

{¶37}   The standard of review for a sufficiency claim and for the denial of a Crim.R. 29 motion for an acquittal is the same. When an appellant challenges the sufficiency of the evidence, we must determine whether the state presented adequate evidence on each element of the offense. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). On the other hand, when reviewing whether a judgment is against the manifest weight of the evidence, we must determine whether the jury clearly lost its way and created a manifest miscarriage of justice. *Id.* at 387.  Because we are reversing Harris's convictions for aggravated murder and aggravated robbery, we need not consider whether those convictions were against the manifest weight of the evidence.

{¶38}   Harris was convicted of aggravated murder in violation of R.C. 2903.01(B), which provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, * * * aggravated robbery, [or] robbery."  He was also convicted of aggravated robbery in violation of R.C. 2911.01(A)(1).

{¶39}   Harris admitted that he had shot Gulleman.  But during trial he denied that he had tried to rob Gulleman.  He now contends that the state did not present sufficient evidence of a robbery or attempted robbery.  We disagree.  State witnesses testified that Harris had told them that he had intended to rob Gulleman. The jury was in the best position to determine the credibility of those witnesses. Further, that Gulleman was found with $210 under his body and that his wallet was still in the car after the shooting does not negate the circumstantial evidence that Harris had attempted to rob Gulleman before shooting him.  We conclude that the state presented sufficient evidence of aggravated murder, aggravated robbery, and

15

having weapons while under disability. And the jury did not lose its way when it found Harris guilty of having weapons while under a disability. The fifth assignment of error is overruled.

{¶40} Therefore, we reverse Harris's convictions for aggravated murder and aggravated robbery along with the firearm specifications. His conviction for having weapons while under disability is affirmed. We remand the cause for a new trial on the aggravated murder with the firearm specifications and the aggravated robbery with the firearm specifications.

Judgment affirmed in part and reversed in part, and cause remanded.

**SUNDERMANN, P.J., HENDON** and **FISCHER, JJ.,** concur.

J. HOWARD SUNDERMANN, retired, from the First Appellate District, sitting by assignment.

Please note:

The court has recorded its own entry this date.