75 S.W.3d 714 (2002)
COMMONWEALTH of Kentucky, Appellant,
v.
M.G., a child under eighteen years of age, Appellee.
Commonwealth of Kentucky, Appellant,
v.
P.A.M., a child under eighteen years of age, Appellee.
Nos. 2000-CA-002095-DR, 2000-CA-002098-DR.
Court of Appeals of Kentucky.
May 10, 2002.
*715 Michael E. Caudill, Warren County Attorney, Timothy K. Chism, Jr., Assistant Warren County Attorney, Bowling Green, KY, for appellant.
Timothy G. Arnold, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, for appellees.
Before GUDGEL, Chief Judge; COMBS and HUDDLESTON, Judges.

OPINION
HUDDLESTON, Judge.
The Commonwealth appeals from a Warren Circuit Court opinion and order reversing a juvenile adjudication and disposition in which Warren District Court found that M.G. had committed first-degree sexual abuse and ordered him into the custody of the Department of Juvenile Justice (DJJ) for placement in a secure residential treatment facility for juvenile sexual offenders. Finding that the district court deprived M.G. of his constitutional right to confrontation by ejecting him from the courtroom during the testimony of his alleged victim and that the procedure constituted clear error, the circuit court remanded for a new adjudication. Likewise, the circuit court cited the fact that both P.A.M. and his lawyer were excluded from this critical stage of the juvenile proceedings against him as the basis for reversing an identical disposition imposed on P.A.M. after the district court found that he committed first-degree sodomy. This Court granted discretionary review. Because the same issue is raised in both cases, the two appeals have been consolidated.

* * *
*716 M.G. was seventeen years old when the alleged offense occurred on March 20, 1999. R.W., the alleged victim, was ten years old at the time. M.G. resided with his older sister (his legal guardian) and her husband, Angela and Carl J.[1] (R.W.'s uncle), and their two young sons. Angela was expecting their third child. According to her testimony, R.W. would visit with the J.'s about three times a week to spend time with their sons while Carl was working and Angela was housecleaning. On those occasions, she would spend the night at their home.
On the evening in question, the J.'s left home for about an hour to get dinner, leaving R.W. with M.G. for the first time without adult supervision. R.W. testified that she was sitting in a recliner in the living room when M.G. came in the room and sat on the couch. M.G. then threw pillows at her and as she removed the pillows from the floor, he grabbed her by the arm and sat her down beside him. When R.W. attempted to move away, M.G. continued holding her arm. Allegedly, M.G. then led her back to his room where he kissed her on the lips and touched her "middle spot," or vagina, through her clothing. At that point, the J.'s returned and M.G. told R.W. to open the door for Angela. As R.W. exited the room, M.G. told her not to tell anyone what had just happened, and she agreed because she "was scared."
When the J.'s entered the home, "everything seemed normal" so they sent R.W. to bed and began to watch a movie. Shortly thereafter, M.G. went into the bedroom, where R.W. and her cousins were sleeping, to play with the Sony Playstation. A few minutes later, R.W. emerged from the bedroom, saying, "[M.G.] won't quit touching me and he keeps on kissing me." M.G. denied the accusation.
On July 14, 1999, a Bowling Green Police Department detective filed a petition charging M.G. with second-degree unlawful imprisonment and first-degree sexual abuse as a result of his alleged abuse of R.W. Due to his age at the time of the offense, M.G. appeared before the juvenile session of the district court where he entered a plea of not guilty. The J.'s appeared with M.G. at his preliminary hearing on July 26, 1999, at which time their rights as enumerated in Kentucky Revised Statute (KRS) 610.060 were read and explained to them. Both M.G. and Angela signed a disclosure form indicating that they were aware of and understood his rights.
At the adjudicatory hearing held on August 16, 1999, three witnesses testified, namely Carl, Angela and R.W. Admittedly, the J.'s had no firsthand knowledge of the events which gave rise to the charges. Their testimony consisted of observations and statements which R.W. made concerning what allegedly happened to her. At the conclusion of their testimony, the Commonwealth requested that the court conduct an interview with R.W. and the court granted that request. Before R.W. testified, however, the court ordered everyone to leave the courtroom with the exception of one bailiff, the prosecutor and M.G.'s lawyer. Defense counsel objected at the beginning of R.W.'s testimony, but only with respect to whether the Commonwealth had established that "sexual contact" did occur. The court then called the alleged victim and proceeded to question her outside the presence of M.G. R.W.'s account of the incident revealed that M.G. *717 had attempted to kiss her and had touched her vaginal area with his hand through her clothing. Counsel for both sides were then permitted to question R.W. While the record is silent on this point, apparently M.G. returned to the proceeding after R.W. had testified. No other witnesses were presented.
Ultimately, the court found M.G. guilty of first-degree sexual abuse, but dismissed the unlawful imprisonment charge. In addition, the court ordered M.G. to undergo a mental health assessment pursuant to KRS 635.510(2), the results of which were considered at his disposition hearing. M.G. was subsequently committed to the custody of DJJ for placement in a secure residential treatment facility for juvenile sexual offenders.
On appeal to the circuit court, M.G. challenged the process alleging several errors, most significantly the court's abrogation of his constitutional right to be present and confront the witness against him. In response, the Commonwealth argued that the issues had not been properly preserved. Relying on the holding in Dean v. Commonwealth,[2] the circuit court disagreed with this contention, concluding that the right to confrontation is a personal one that cannot be waived by the action or inaction of counsel. The circuit court dismissed the remaining claims of error as being without merit. We granted the Commonwealth's request for discretionary review in order to answer the question of whether a defendant can waive his right to be present during his accuser's testimony and determine whether the issue is preserved for review despite the lack of a contemporaneous objection.

* * *
On April 15, 1999, elementary school officials removed J.M., P.A.M.'s then eight-year-old brother and alleged victim, from the classroom for exhibiting inappropriate sexual behavior. School officials then called Judy Brown, a child abuse investigator employed by the Department of Community Based Services, who interviewed J.M. and his sister P.M. at the school in the presence of Deena Holland, the family resource director for the school, and Susan Rice, an adult who had apparently known the children for some time and was "present to support" them.
During the interviews, J.M. accused his brother of engaging in sexual contact with him on two or more occasions during the previous months. Specifically, J.M. accused P.A.M. of masturbating in his presence and of inserting his penis into J.M.'s anus. When Brown questioned J.M.'s sister P.M. regarding these allegations, she became upset and called J.M. a liar. At this point, Brown contacted her supervisor and the police department to request assistance. Officer Anton Kahlil Flesher responded to the call. Upon his arrival, Flesher and Brown interviewed J.M. together, again in the presence of Holland and Rice. Brown's supervisor contacted Kim Vincent, a colleague of Brown's, to interview P.A.M., J.M. and their father at the police station.
Later that day, Flesher located P.A.M. at his school and brought the fourteen-year-old to the police station without an accompanying parent or guardian. Flesher then questioned P.A.M. about J.M.'s allegations; and Vincent interrogated P.A.M. separately. P.A.M. made incriminating oral statements to Flesher and Vincent during these interviews.
At trial, Flesher testified that P.A.M. was "in custody" at the time of the interview since he was transported to the police station for questioning, was not free to *718 leave headquarters and did not have a parent present during the interrogation. Flesher also admitted that he did not advise P.A.M. of his rights to an attorney and to remain silent in accordance with the dictates of Miranda v. Arizona.[3] Vincent also neglected to inform P.A.M. of these rights.
After interviewing P.A.M. at police headquarters, Vincent transported him to the Warren County Justice Center where they met Brown who questioned P.A.M. in a stairwell adjacent to the courtroom. Again, he was questioned without being made aware of his rights pursuant to Miranda and in the absence of a parent or guardian. Brown reported that P.A.M. made incriminating statements[4] similar to those he had made earlier to Vincent. Days later, Brown questioned P.A.M. again, this time at the home of his biological mother. On that occasion, P.A.M. denied the allegations. Defense counsel did not move to suppress any of the statements P.A.M. made to Brown.
Flesher filed a juvenile complaint against P.A.M. charging him with first-degree sodomy, and he subsequently appeared in the juvenile session of district court. At the adjudicatory hearing, four witnesses testified: Flesher, Brown, Vincent and J.M., the alleged victim. Because Flesher failed to inform P.A.M. of his rights pursuant to Miranda, the court suppressed his testimony regarding P.A.M.'s statements. Over defense objection, Brown was permitted to relay the content of the out-of-court statements J.M. and P.M. made to her as well as the substance of P.A.M.'s incriminating statements.
At the Commonwealth's request and without defense objection, the court cleared the courtroom and proceeded to question J.M. P.A.M., his lawyer and the prosecutor were unable to see or hear what transpired during this critical stage of the proceedings. After the court completed its interview with J.M., P.A.M., his lawyer and the prosecutor were permitted to reenter the courtroom at which time the court summarized J.M.'s testimony and described its impressions of his demeanor while testifying.
P.A.M. was found guilty of first-degree sodomy and, like M.G., was ordered to undergo a mental health assessment to be performed by the DJJ for use at the disposition hearing. Defense counsel did not object to the evaluation. Ultimately, the court ordered P.A.M. committed to the custody of the DJJ for placement in a juvenile sexual offender treatment program.
On appeal, the circuit court reversed, finding that P.A.M.'s exclusion from the courtroom during the testimony of his alleged victim violated his personal right to confrontation and, because the violation constituted a clear error, it was reviewable despite the lack of a timely objection. In addition, the circuit court concluded that the statements made by J.M., P.M., the school officials and the family members were inadmissible hearsay declarations as there is no recognized exception to the hearsay rule for social workers or the results of their investigations. Because the portion of Flesher's testimony which was not suppressed related to the content of statements by others and was admitted to prove how he acted in response to the statements, the circuit court determined that the "investigative hearsay" should have also been excluded.
Finding that the unpreserved issues of whether P.A.M.'s statements to Brown and *719 Vincent can be suppressed due to their failure to advise him of his rights pursuant to Miranda and whether P.A.M. can invoke his right to remain silent with regard to the preparation of the mental health assessment ordered by the district court are likely to recur on retrial, the circuit court provided guidance as to how both issues should be addressed. With respect to the former issue, the circuit court indicated that, if on retrial the defense moves to suppress the statements P.A.M. made to the social workers, the district court should examine the totality of the circumstances surrounding their questioning of P.A.M., determine objectively whether P.A.M. was in custody when they interrogated him and ascertain whether they were acting as agents of law enforcement at the time of the interrogation.
Confirming that the privilege against self-incrimination extends to sentencing in any criminal case and that a defendant cannot be compelled to cooperate with a psychiatrist if he does not offer psychological evidence of his own, the circuit court found that, if the case reaches the disposition stage on retrial, P.A.M. has the right to remain silent during the court ordered evaluation without a negative inference being drawn from his silence. It is that order which is the subject of the Commonwealth's second appeal.

* * *
If we are to affirm the circuit court's reversal of the district court's orders, it must be on the ground that a palpable error was committed by the district court, a concept articulated in Kentucky Rule of Criminal Procedure (RCr) 10.26.[5] On review, we must determine whether the district court's error was of such magnitude that "manifest injustice has resulted."[6] While the constitutional error standard, a "harmless beyond a reasonable doubt" review, applies when the error has been preserved, it does not control when there has been no contemporaneous objection. Although the meaning of "manifest injustice" has never been fully explained, "it applies where the appellate court `believes there may have been a miscarriage of justice.'"[7]
In Price v. Commonwealth,[8] the Kentucky Supreme Court noted that it has "long recognized the importance of the constitutional right of the accused to be present with his counsel at all stages of a trial." That right originated with the Sixth Amendment to the United States Constitution, commonly referred to as the Confrontation Clause, which provides as follows:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.
In Faretta v. California,[9] the United States Supreme Court emphasized that the defendant's right to be present and confront his accusers is a personal right under *720 the Sixth and Fourteenth Amendments to the U.S. Constitution. "It is the accused, not counsel, who must be `informed of the nature and cause of the accusation,' who must be `confronted with the witnesses against him,'.... The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."[10]
Section 11 of the Kentucky Constitution specifically preserves the right to confrontation and to be present for its citizens with similar language: "In all criminal prosecutions the accused has the right to be heard by himself and counsel; to demand the nature and cause of the accusation against him; to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor." These rights are further spelled out in RCr 8.28 which, in relevant part, provides that: "(1) The defendant shall be present at ... every critical stage of the trial."
As noted by Kentucky's highest court in Commonwealth v. Wasson,[11] Kentucky has afforded protection of individual rights beyond that guaranteed on the federal level, citing Dean v. Commonwealth,[12] involving the right of confrontation, as illustrative. In Dean, the Court held that because the right to be present and confront is personal in nature under Section 11, only the defendant can waive this right, and the waiver must be sufficiently clear as to indicate a "conscious intent."[13] These constitutional rights have been made applicable in the context of state juvenile proceedings.[14] This policy has been explicitly adopted by the General Assembly as indicated by KRS 600.010(2)(g) which provides: "Unless otherwise provided, such protections belong to the child individually and may not be waived by any other party."
In the present case, the Commonwealth concedes that the exclusion of the juveniles was an error but argues that the issue is not preserved for review because defense counsel failed to object when the court announced that it was clearing the courtroom. We disagree. The error is not harmless as reflected by the preceding legal authority.
In Dean, the accused was absent during the deposition of two key prosecution witnesses.[15] Although Dean's counsel attended the depositions and cross-examined the witnesses, he waived Dean's right to be present and the depositions were later read at trial.[16] Because there was no indication in the record that it was Dean's conscious intent to waive his right of confrontation, his counsel's waiver was deemed ineffective and the Court held that deposing the witnesses in Dean's absence was a violation of Section 11 of the Kentucky Constitution.[17] In reaching that conclusion, the Court determined that both witnesses' testimony by deposition "played a significant role in the overall weight of the evidence against Dean" and that it was "impossible to predict with certainty what effect recognition of [Dean's] right to be present and to confront [the] witnesses during their live testimony would have had *721 in the outcome of the case."[18]
Here, there is no doubt that the testimony of the victims had a significant influence on the outcome as, is usually the case in these instances, they were the only eyewitnesses to the alleged abuse, their testimony provided the only evidence of sexual contact which is an essential element of the offense, and the court found their testimony credible. In P.A.M.'s case, the court explicitly acknowledged its reliance on the testimony in question, saying: "I'm basing my decision on the fact in talking with the child, the child is extremely believable and I think he has been consistent. He didn't hear any of the testimony in here and yet when questioned he was, his testimony is basically what he had told everybody all along."
It is impossible to gauge the impact of the court's decision to exclude M.G. and P.A.M. (and his counsel) from such a critical stage of the proceedings. However, it was the most crucial testimony provided by the Commonwealth's principal witness in both cases and with respect to P.A.M., the impact on the fact finder is definite. The parties were not forewarned of the court's intention to proceed in such a manner and, accordingly, the parties were deprived of the opportunity to confer with counsel regarding strategy. There was no overt waiver by counsel in either case, nor was there any suggestion that the juveniles themselves expressed a conscious intent to relinquish their right to be present when the Commonwealth's principal witness testified or to participate in the cross-examination of that witness. Barring M.G. and P.A.M. from the courtroom under these circumstances deprived them of a fundamental, personal right and constitutes an error which warrants reversal even in the absence of an objection.

* * *
After conducting extensive public hearings on the matter of child sexual abuse, the General Assembly responded to the plea for witness protection, accepting the philosophy that testifying in a formal courtroom atmosphere at a criminal trial before the defendant, judge and jury is one of, if not the most intimidating and stressful aspects of the legal process for children.[19] In an exercise of its legislative policymaking function, the General Assembly enacted KRS 421.350 in order to balance these competing interests. Pursuant to the statute, the testimony of a child witness can be presented via videotape recorded before trial, by closed circuit television used during trial, or by in-court screening of the defendant from the sight and hearing of the witness with the proviso that consideration must be given to the defendant's rights contained in the Sixth Amendment of the U.S. Constitution and Section Eleven of the Kentucky Constitution. Whichever method is employed, any infringement on the rights of the accused must be minimal.[20]
In upholding the constitutionality of the statute in question, the Supreme Court made it clear that the Commonwealth bears the burden of persuading the trial *722 court that it is "reasonably necessary"[21] to shield the child victim from the emotional distress that often results from face-to-face confrontation with the alleged perpetrator and said that after such a showing is made and the technical details have been worked out, "the testimony will be taken with the child screened from the sight and hearing of the defendant while at the same time the defendant can view and hear the child and maintain continuous audio contact with defense counsel."[22] The Court also emphasized that the applicable sections of the statute apply only to a narrow class of witnesses, i.e., children twelve years old or younger who are victims of sexual offenses. They impose no restrictions on cross-examination, allow the fact finder to observe the demeanor of the witness and "require that defendant be present to see and hear the testimony."[23]
In the proceedings at issue, none of the above prerequisites was met. To begin with, the court made no attempt to determine whether a compelling need existed to shield the alleged victims. Beyond that, neither juvenile defendant was present for the alleged victims' testimony, nor was either afforded the opportunity to see or hear the witnesses, let alone cross-examine them. In short, the statutory safeguards which the Court in Willis cited as reasons for classifying the outlined procedures as "the functional equivalent of testimony in court" were disregarded entirely in the present cases.
According to the Commonwealth, the necessary video equipment was not available.[24] A lack of technical facilities to accommodate the mandatory protections for the accused does not justify completely abridging his/her rights. If the technology is not available, the accused cannot be excluded from the courtroom. "[I]t is of primary import that an accused's constitutional rights remain preeminent."[25]

* * *
On appeal to the circuit court, P.A.M. also argued that the court erred in permitting Flesher, Brown and Vincent to testify as to the out-of-court statements made by the alleged victim and others because the statements constituted inadmissible hearsay. Defense counsel's objection to the admission of these statements was overruled. As reflected by its decision, the district court relied directly on the statements attributed to J.M., the alleged victim, to corroborate his testimony. Specifically, the court indicated that it found J.M.'s testimony credible because it was consistent with his out-of-court statements.
Kentucky Rules of Evidence (KRE) 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." By definition, the statements in question, i.e., those made to investigators by J.M., his sister, P.M., the school officials and family members, are hearsay declarations. Hearsay is inadmissible *723 unless a recognized exception applies, and no specific exceptions have been argued by the Commonwealth at any level.
In Souder v. Commonwealth,[26] the Supreme Court stated unequivocally that there is no recognized hearsay exception for social workers or the results of their investigations. In so doing, the Court reaffirmed a prior holding that the testimony of a social worker is categorized as inadmissible hearsay, again rejecting the argument that the need for this type of hearsay evidence should cause it to fall within the residual exception to the hearsay rule.[27] Accordingly, we hold that the statements made to Brown and Vincent were improperly admitted and must be excluded on retrial.
Although the court suppressed the portion of Flesher's testimony relating to the statements P.A.M. made to him, Flesher was permitted to testify as to the content of other out-of-court statements made to him during the course of his investigation. In Sanborn v. Commonwealth,[28] the Court determined that the extensive use of such testimony, "offered under the guise of a so-called `investigative hearsay' exception to the hearsay rule[,]" standing alone required reversal.[29] At the outset, the Court said, "hearsay is no less hearsay because a police officer supplies the evidence. In short, there is no separate rule, as such, which is an investigative hearsay exception to the hearsay rule."[30] "Investigative hearsay" is a "misnomer, an oxymoron."[31] The rule is that a police officer may testify about information furnished to him only when it tends to explain the action taken by the officer as a result of this information and the taking of that action is an issue in the case.[32] Here, the Commonwealth contends that the testimony was offered to prove how Flesher acted in response to the information he received, but it would only be admissible if the motivation for his actions was an issue. Why Flesher acted the way he did is not an issue; his testimony must also be excluded when the case is retried.
P.A.M. also argues that the court should have suppressed the testimony of Brown and Vincent as it related to the statements P.A.M. made to them since they failed to inform him of his rights in accordance with Miranda. This issue was raised for the first time on appeal to the circuit court. Defense counsel did not ask the district court to suppress the evidence or object to its introduction on this basis. Accordingly, the issue is not preserved for our review. While we agree with the circuit court's assessment of the factors which must be considered when determining if a social worker is required to inform juveniles of their constitutional rights, further elaboration as to this issue is unwarranted; the issue is moot since we have already excluded the testimony on separate grounds.
P.A.M.'s final argument, also raised for the first time on appeal, is that the district court's order directing him to participate in a mental health assessment as required by KRS 635.510(3) was improper since he was not advised of his right to remain silent prior to the evaluation. While this issue was not preserved for our review, we *724 offer the following guidance as it presents a question that is apt to resurface.
In Estelle v. Smith,[33] the United States Supreme Court concluded that "[t]he considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to [a] pretrial psychiatric examination," agreeing with this Court that the defendant's Fifth Amendment rights were violated when the trial court admitted at the penalty phase of a trial the testimony of the doctor who had examined the defendant while he was in custody.[34] The Court went on to hold that when a criminal defendant does not attempt to introduce any psychiatric evidence, he may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.[35] That protection was extended to the sentencing phase of any criminal case in Mitchell v. United States.[36] In Mitchell, the Court also said that the normal rule in a criminal case is that no negative inference may be drawn from the defendant's silence and declined to adopt an exception for the sentencing phase.[37] Consistent with this authority, if this case reaches the disposition phase on retrial, P.A.M. has the right to remain silent during the mandatory mental health assessment performed by DJJ, and no negative inference may be drawn from his silence.
Because the district court committed palpable error when it excluded M.G. and P.A.M. (and his counsel) from the courtroom during perhaps the most critical stage of the proceedings against them, we affirm the circuit court's reversal of both adjudications and remand these cases to Warren District Court for proceedings consistent with this opinion.
ALL CONCUR.
NOTES
[1] To shield the identity of the juveniles involved in these cases, we use their initials and the initials of their relatives.
[2] Ky., 777 S.W.2d 900 (1989).
[3] 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] P.A.M. indicated that he "did him between the legs."
[5] See Sherley v. Commonwealth, Ky., 889 S.W.2d 794, 802 (1994).
[6] Id.
[7] Id. (Citation omitted.)
[8] Ky., 31 S.W.3d 885, 892 (2000).
[9] 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
[10] Id., 422 U.S. at 819, 95 S.Ct. at 2533, 45 L.Ed.2d at 572.
[11] Ky., 842 S.W.2d 487, 497 (1992).
[12] Supra, n. 2.
[13] Id. at 903.
[14] In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).
[15] Dean, supra, n. 2, at 903.
[16] Id.
[17] Id.
[18] Id. In Fugate v. Commonwealth, Ky., 62 S.W.3d 15, 20 (2001), the Court, agreeing with Justice Leibson's dissent in Dean, held that there was "no reason, constitutional or otherwise, to create a rule that counsel cannot waive his client's presence at depositions" or competency hearings. Fugate is distinguishable since it involved a waiver that was explicit, was made by counsel and did not occur at trial. See also McKinney v. Commonwealth, Ky., 60 S.W.3d 499, 510 (2001).
[19] Commonwealth v. Willis, Ky., 716 S.W.2d 224, 227 (1986).
[20] Id. at 227.
[21] In the statute, the standard is "compelling need."
[22] Willis, supra, n. 19, at 227.
[23] Id. (emphasis supplied).
[24] We take judicial notice (Ky. R. Evid. (KRE) 201(c)) of the fact that the Warren County Justice Center, where the proceedings in question took place, had several rooms with video capabilities. While district court sessions were recorded on audiotape only, accommodations could have been made to enable the court to comply with the statutory requirements.
[25] George v. Commonwealth, Ky., 885 S.W.2d 938, 940 (1994).
[26] Ky., 719 S.W.2d 730, 734 (1986).
[27] Id. at 734.
[28] Ky., 754 S.W.2d 534 (1988).
[29] Id. at 541.
[30] Id.
[31] Id.
[32] Id.
[33] 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).
[34] Id. at 467, 101 S.Ct. at 1875.
[35] Id. at 468, 101 S.Ct. at 1876.
[36] 526 U.S. 314, 328, 119 S.Ct. 1307, 1315, 143 L.Ed.2d 424 (1999).
[37] Id. at 328, 119 S.Ct. at 1314.