**AFFIRMED and Opinion Filed August 17, 2021**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-21-00138-CV

## IN THE MATTER OF Z.T., Relator

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JD-20-00919-X**

## MEMORANDUM OPINION
Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Reichek

In this accelerated appeal, Z.T. challenges the juvenile court's order waiving jurisdiction and transferring her case to criminal district court for trial as an adult. Z.T. brings five issues contending the juvenile court (1) failed to specifically explain its reasons for granting the transfer, (2) failed to consider all the evidence, (3) failed to admit critical evidence at the hearing, (4) based its decision on an improper factor, and (5) erroneously concluded that Z.T. was sufficiently sophisticated and mature to be transferred. For the reasons that follow, we affirm the juvenile court's order.

## Factual Background

Z.T. and two adult co-defendants, Phillip Baldenegro and Jesse Martinez, were arrested and charged with aggravated robbery and capital murder. At the time of the offenses, Z.T. was sixteen years old and in a relationship with Baldenegro, who was eighteen years old. Martinez and Baldenegro were friends. According to Detective Joshua Stelter of the Grand Prairie Police Department, Z.T. lured Cristian Lobo and Carlos Murillo to Baldenegro's apartment so that Baldenegro and Martinez could rob them. During the course of the robbery, Lobo was injured and Murillo was shot and killed. The testimony at the transfer hearing revealed the following information gathered from a police investigation.

On August 3, 2019, Z.T. sent a text message to Lobo pretending to be a girl named Julie. Lobo had met "Julie" approximately one month earlier at a party. Z.T. asked Lobo if he would like to come over and she gave him the address of Baldenegro's apartment. Because Z.T. did not speak Spanish, and Lobo spoke primarily Spanish, Z.T. had Baldenegro help her write the text messages.

One of Baldenegro's neighbors stated she was outside her apartment with her father on August 3 when she saw Martinez knock on Baldenegro's door. When Baldenegro opened the door to let Martinez in, he told the neighbor to check her phone. Baldenegro then sent her a text message that said, "Take your dad inside, I'm about to hit a lick." Detective Stelter testified that "hit a lick" was a commonly used phrase referring to committing a robbery or theft.

–2–

Soon therafter, Lobo arrived at the apartment complex with Murillo. Z.T., who was waiting in the parking lot, waved them down and led them to Baldenegro's apartment. The neighbor saw Z.T. take the men into the apartment and heard multiple locks on the door being engaged.

Once they were in the apartment, Z.T. took Lobo to a back bedroom. Baldenegro sent a text message to Z.T. saying, "let me know when you are ready and I'm going to pop out." When Z.T. left the bedroom, Baldenegro entered and began beating Lobo with his fists and a firearm. At the same time, Martinez entered the living room carrying a gun and began to assault Murillo, knocking out multiple teeth. Neither Lobo nor Murillo had a weapon.

Lobo ran from the bedroom into the living room where Baldenegro and Martinez held him and Murillo at gunpoint and ordered them to turn over their clothing, wallets, and cell phones. After undressing, Lobo and Murillo were able to escape the apartment and flee towards their car. Z.T. followed them out the door. The neighbor was still outside the apartment and stated that Z.T. casually walked by her and said "bye" as if nothing was wrong. The neighbor then saw Baldenegro and Martinez run out of the apartment and follow Lobo and Murillo into the parking lot.

When Lobo and Murillo reached their car, they realized they could not leave because they no longer had the keys. Baldenegro and Martinez caught up with them and used the keys they had taken to unlock the vehicle. Z.T. then approached from the other side of the parking lot and began searching through the car. Murillo told

Z.T. she could take whatever she wanted but begged her to leave his keys and identification papers.

While Z.T. continued to search through the car, Baldenegro and Martinez resumed their assaults on the men. The fighting continued until Baldenegro shot Murillo, killing him. At that point, Baldenegro and Martinez fled in one direction and Z.T. fled in a different direction.

Baldenegro and Martinez ran to a local high school where they attempted to dispose of some of the stolen property. They then called a friend, Anthony Munoz, to come pick them up. Munoz said Baldenegro was extremely upset and said something to the effect of "I fucked up. I shot somebody." The three men then went to Martinez's house, where Baldenegro and Martinez changed clothes and smoked marijuana. In a later search of the house, police recovered the guns used in the offense.

Sometime later, Z.T. contacted Baldenegro and asked him to pick her up. Baldenegro, Martinez, and Munoz went to meet Z.T. and, when they arrived, Munoz saw Z.T. get out of a gray SUV before getting into the back seat of his car with Baldenegro. Munoz said Baldenegro continued to be very upset and emotional about what had occurred, and Z.T. tried to "cheer him up" by rubbing his back, kissing him, and telling him she was proud of him. According to Munoz, Z.T. was acting "happy and normal" and made a joke about the shooting victim going "out with a bang." Z.T. additionally went through Lobo's wallet and made fun of his appearance

–4–

on his identification card. Z.T. was excited that there was money in the wallet, which she said she would use to buy cigarellos. Photographs later recovered from Z.T.'s phone showed her using cigarello wrappers to smoke marijuana. Z.T. went with the three men to buy more marijuana, which they smoked in the backyard of the house where Z.T. lived with her parents and one of her siblings. Z.T. continued to act very casual, as if it was "just another day."

By this time, police had responded to a report of the shooting. Witnesses at the scene were able to positively identify both Baldenegro and Martinez as being involved in the offense. Surveillance footage from a church next to the apartment complex showed Z.T. fleeing the scene shortly after the shooting occurred. Arrest warrants were issued for Baldenegro and Martinez. Martinez was arrested early in the morning on August 4. Shortly thereafter, Baldenegro, accompanied by his mother, turned himself in to the police.

On the same day Martinez and Baldenegro were arrested, Z.T. left on a trip to Florida with a friend. She continued to exchange text messages with Baldenegro before he turned himself in. Baldenegro told Z.T. how much he loved her and that he loved her enough to be going away. Z.T. responded that she was "sad as fuck" with a crying emoji. Later that same day, Z.T. sent a text message to an unidentified male saying that she was not "looking for anything serious" because she had just gotten out of a relationship. Z.T.'s phone showed no further communications with Baldenegro.

After Z.T. returned from Florida, messages and pictures on her phone showed that she continued to engage in normal activities. Z.T. also continued to use drugs and she had pictures and "recorded sexual encounters" of herself with other men.

Z.T. was arrested on August 29, 2019. Although police officers looked for Z.T. at school that day, they discovered she had left school grounds shortly after checking in. Z.T. was eventually found at a nearby store. When officers attempted to arrest Z.T., she became belligerent and yelled, "[T]hey are lying on me, they are lying on me, call my mom, they are lying on me."

Police reports showed that Z.T. had been reported as a runaway approximately ten times during the period of September 28 to July 29. According to Detective Stelter, Z.T. would often leave her house because of discipline issues with her parents. He further stated that reports showed Z.T. would sometimes become violent with her parents and then flee. An investigation into the disciplinary measures used by Z.T.'s father showed they were reasonable. Z.T.'s mother told officers that Z.T. would normally return home after three days, so she generally would not report her as missing unless she was gone for longer than that. Z.T.'s phone showed text messages from her mother, begging her to come home or contact her, to which Z.T. did not respond.

Z.T.'s phone showed that text messages with Baldenegro began in April 2019, four months before the offenses were committed. Detective Stelter stated it appeared they were in an immediate dating relationship. Messages between them referred to

–6–

"licks" and, in one text, Baldenegro stated, "my glock is full of hollows, who are we going to kill?" Z.T. responded, "say less." Detective Stelter understood "say less" to mean that Z.T. did not want Baldenegro sending text messages that were incriminating.

At one point, text messages showed that Z.T. was angry with a friend named Julie. Z.T. sent a message to Baldenegro that she wanted to shoot at the girl's house. Baldenegro responded that he could lure Julie to his car, give Z.T. a gun, and let her do what she needed to do. Z.T. again sent a message saying something to the effect of "say less." When Baldenegro asked Z.T. if she wanted to "shoot up her crew," Z.T. responded that she did. Baldenegro then asked if she wanted to shoot to scare or shoot to kill, and Z.T. replied that she did not care who or what she hit. She stated, "I don't even care if I hit her grandma. That's what you get for fucking with my family."

Z.T.'s phone also contained a text message conversation between her and Julie about purchasing drugs, including marijuana and cocaine. Z.T. sent messages to a man arranging a drug purchase and asked Julie how to give the man directions in Spanish. At one point Julie stated, "let's get these guys fucked up and take their shit." Z.T. again responded, "say less." Z.T. later messaged Julie that one of the men from whom they purchased drugs was trying to kiss her neck. Julie responded that Z.T. should let him, but not allow him to "leave a mark."

In addition to the text messages, Detective Stelter testified pictures recovered from Z.T.'s phone showed she often took "selfies" with firearms, and particularly with pistols. The detective was questioned about one picture in particular. The photo depicted a girl with a barrel of a gun pointed at her head and the caption, "Tf," across her face. Although the suggestion was that the girl was Z.T., Detective Stelter said he could not make a positive identification because the girl's face was covered by the caption and the photo was blurry. He also said he did not know who was holding the gun. When asked why he did not investigate the picture, he stated that photos and video taken around the same time showed Z.T. practicing a "concerned look" and nothing indicated to him "whether [the picture] was truly her or whether it was a stunt for Instagram or if it was legitimate." Detective Stelter further stated there was no indication of when the photograph was taken.

Several months after Z.T. was arrested, Detective Stelter stated he became aware that Z.T. had made an outcry that she had been sex trafficked by Baldenegro. Stelter said that the outcry was "followed up" on by the Dallas County District Attorney's Office rather than the Grand Prairie Police Department. Stelter additionally stated he saw nothing in his investigation that showed Z.T.'s relationship with Baldenegro was anything other than consensual. There were no communications leading up to the offenses to indicate that Lobo or Murillo thought they were meeting Z.T. for sex. All the communications between Z.T. and Baldenegro before the offenses referred only to "licks."

The State filed its petition for discretionary transfer of Z.T. from juvenile court to criminal district court on October 2, 2020. Shannon Wright, a probation officer for the Dallas County Juvenile Department, was assigned to create a Social Evaluation and Investigative Report. The report stated that Z.T. had one prior referral to the juvenile department on December 19, 2018, for possession of a controlled substance. Z.T. was placed on deferred adjudication probation. During the probationary period, Z.T. failed to complete four monthly reports and did not participate in the required Youth 180 program. Despite these violations, the case was closed on August 9, 2019.

On January 14, 2019, the Grand Prairie Independent School District referred Z.T. to the Juvenile Justice Alternative Education Program for felony drug possession. The expulsion period was for ninety days. While attending the JJAEP, Z.T. continued to run away from home and associate with negative peers. Z.T.'s mother asked to withdraw Z.T. from the JJAEP when a fellow student in the program began to threaten her.

On April 29, 2019, Z.T. was admitted to a drug rehabilitation program for treatment. Z.T. was committed for thirty days and was discharged in May 2019.

Wright interviewed Z.T. and her parents as part of her investigation. Z.T. told Wright that she began smoking marijuana when she was twelve years old. She reported limited use of other drugs including Xanax when she was fifteen, ecstasy in April and June 2019, and two lines of cocaine in July and August 2019.

Z.T.'s father stated he had a good relationship with Z.T. and that she was a "daddy's girl." Z.T. also reported to Wright that she had a positive relationship with her father, saying she had a close bond with him. In an earlier evaluation, however, Z.T. reported that her father had been physically abusive. When questioned about this by Dr. Leilani Hinton, the court-appointed psychologist, Z.T. was advised not to answer. Wright specifically asked Z.T. if she had ever been abused and she responded that she had not.

Z.T. and her mother stated they also had a good relationship. Z.T. said her mother and father had both been "more than supportive." According to Z.T.'s mother, Z.T. was not a "problem youth," but she had allowed her peers to influence her negatively. In particular, Z.T.'s parents disapproved of her relationship with Baldenegro. Z.T.'s mother stated that Z.T.'s behavior and demeanor changed when she began to associate with Baldenegro.

In a psychological evaluation report prepared by Dr. Hinton dated January 5, 2021, she stated Z.T. denied having any symptoms of depression, but said she felt anxious about what would happen to her in court. Z.T. had a previous diagnosis of anxiety and mood disorders for which she was prescribed Zoloft, Gabapentin, and Trazadone. Dr. Hinton's report stated that it appeared Z.T. had experienced some trauma that was amplifying her current level of anxiety.

Intelligence test results showed that Z.T. had average verbal intelligence and below average non-verbal intelligence with a composite score of 78 that was better

than 7% of her age-matched peers. Dr. Hinton noted that Z.T. had achieved a composite score of 93 on a previous intelligence test, suggesting that the results of the current test "may be an underestimate of her true abilities." She further noted that Z.T. appeared to be functioning within the average range of intelligence and had no significant mental illness or mental retardation as defined by Chapter 55 of the Texas Family Code. Overall, Dr. Hinton characterized Z.T. as being as sophisticated and mature as her peers. She further stated Z.T. understood the legal implications of the transfer motion and was capable of assisting her attorney in her defense.

Dr. Hinton's assessment of Z.T.'s personality was that she was "self-satisfied" and had a "clear sense of who she is and what she wants." She stated that Z.T. was normally confident and optimistic and "she approaches life with a clear sense of purpose and distinct convictions." Dr. Hinton further characterized her as "resilient and adaptive in the face of great adversity." With regard to her amenability to treatment, Dr. Hinton stated Z.T.'s "level of interest in treatment is comparable to that of other adolescents, however her motivation towards change and treatment is relatively low given she is satisfied with herself as she is." Dr. Hinton went on to say that Z.T. "sees little need to change her behavior and may be defensive to discuss personal issues or problems." Dr. Hinton also discussed Z.T.'s strengths stating that her willingness to listen, learn, and comply with treatment indicated she could do well. In addition, Z.T. felt she had "robust family support" to which she could turn for help if needed.

In a Thematic Apperception Test designed to reveal dominant drives, emotions, and inner conflicts, Dr. Hinton characterized Z.T. as initially guarded but quickly adjusting to the task. The test involved creating stories based on ten ambiguous cards. Most of Z.T.'s responses evoked dysphoric feelings including sadness and exhaustion, but generally led to positive outcomes, suggesting that she is optimistic about the future. One card evoked a particularly strong response that had themes of sexual assault and rape.

Dr. Hinton's report noted that Z.T. had been referred to Traffic 911 and the Dallas Children's Advocacy Center due to concerns of sex trafficking. In the portion of the referral form for "self-reports by youth of exploitation/trafficking," it stated that Z.T. "met one of the men who exploited her on Instagram, began a perceived romantic relationship with him before she was trafficked" and "[h]er offense was related to a trafficking incident." Hinton testified that the child exploitation unit attempted to interview Z.T. about her outcry, but Z.T.'s attorneys advised her not to speak to them. Hinton further stated that, although the referral form uses the term "Confirmed Victim of [Child Sex Trafficking]," the information on the form was based on Z.T.'s self-reporting and it was her understanding that there had not been an independent investigation. The form also stated that Z.T. had no history of sexual abuse and the total number of times she had run away from home was only two.

During her detention, Z.T. mostly resided in the honors dorm. She was released from detention on September 2, 2020, on strict conditions set by the juvenile

court, including participation in Pre-Adjudication Intensive Supervision, electronic monitoring, and intensive outpatient drug treatment. Z.T. was also ordered to have no contact with "negative peers," including Baldenegro and Martinez, and was only allowed to leave the house accompanied by a parent to attend church, medical/mental health appointments, or meet with her attorney. Wright reported that Z.T. had complied with all the ordered terms and conditions of her release. With respect to schooling, Z.T. stated that, prior to her arrest, she earned As and Bs in school and was enrolled in advanced placement classes. While in detention, Z.T. was attending classes virtually and again earning As and Bs.

Ultimately, after reviewing Z.T.'s history and social background, Wright recommended that the State's petition for transfer be granted. She stated that, in her opinion, Z.T.'s level of sophistication appeared higher than would be expected of a person her age. She further opined that the prospects of adequate protection of the public and the likelihood of Z.T.'s rehabilitation with the services, procedures, and facilities available to the juvenile court were remote.

When questioned about Z.T.'s outcry of sex trafficking, Wright stated that, although she had not seen the referral form, she became aware of the trafficking allegations several months before she interviewed Z.T. when they were reported in the media. Wright testified that, while the referral form was dated October 18, 2019, her department had not begun using the forms until February 1, 2021, a few days before Z.T.'s transfer hearing began. Dr. Hinton later clarified that the form existed

in 2019, but the protocols used by Wright's department to identify victims of sex trafficking did not go into effect until February 2021. Wright stated that, because Z.T. denied all abuse allegations in her interview, and neither Z.T. nor her parents disclosed any information to her about potential sex trafficking, there were no further steps she could take on that issue.

As witnesses for Z.T., the defense called Rebekah Charleston, Dr. Haesung Han, and Emily Chavez. Charleston testified she volunteered to work as Z.T.'s case advocate after seeing media coverage about her case. Charleston was a former victim of sex trafficking and worked as the strategic initiatives director for the Jensen Project helping to support the emotional and social recovery of other trafficking victims. After interviewing Z.T. and her family, Charleston opined that Z.T. "possessed all the indicators that lead a child to become trafficked." The indicators identified by Charleston were Z.T.'s history as a runaway, abuse in the home, and past sexual abuse. As evidence that abuse had occurred, Charleston pointed to a written affidavit signed by Z.T. containing allegations that she had been sex-trafficked, statements by Z.T.'s parents that her behavior changed after she met Baldenegro, and the facts of the offense.

With respect to the offense, Charleston stated it was a classic example of a "trick role" in which a victim of sex trafficking is forced to lure a customer to a hotel or house with the promise of sex and then the customer is robbed by the trafficker. If the victim does not comply with the trafficker's demand, they can be beaten or

–14–

killed. In this case, Charleston said, Z.T. was told to lure Lobo and Murillo to Baldenegro's apartment and Z.T.'s life and the life of her family were threatened if she did not comply.

Z.T. also told Charleston that Baldenegro continually supplied her with drugs and had raped her several times. Z.T. told her that, on the night before the offenses occurred, Baldenegro forced himself on her in her bedroom and her parents came home while it was happening. Baldenegro got into a verbal altercation with Z.T.'s father and, as he was leaving the house, he told Z.T. that her father had disrespected him and she now "owes him." Charleston said Z.T. knew she needed to comply with Baldenegro's demands to prevent future violence.

In discussing the romantic nature of the text messages between Z.T. and Baldenegro, Charleston said that she read the messages through a "survivor's lens" and as a subject matter expert. Although it was possible that the messages were simply normal expressions of affection, Charleston said that a quick escalation of affectionate talk, and offers to help Z.T. get revenge on others, was indicative of "fast tracking" and grooming the victim. Charleston further stated the absence of direct evidence in the text messages that Z.T. was being trafficked to others for sex was not surprising because "a criminal would be a fool to document evidence of sex transactions."

Charleston also said it was not surprising that Z.T. engaged in sexual activities with other men after Baldenegro was arrested. She said Z.T. was "used to living in

that level of trauma and sexual encounters" and "it would be normal for that behavior to continue until there has been an intervention or recovery made." In Charleston's experience, victims of sex trafficking frequently don't report what has happened to them because they don't see themselves as victims. They blame themselves and their choices for the things that have happened to them. She conceded, however, that it was possible for a person to create a narrative for their own advantage. Overall, Charleston stated she believed Z.T. would do well with rehabilitative services, could be an example to other victims, and was not a violent person or a danger to the community.

Dr. Haesung Han testified she was a clinical psychologist, a board-certified therapist, and the co-founder of Poetic, an organization that provides treatment for victims of sex trafficking. Dr. Han stated that, although she had not spoken with Z.T., Z.T.'s file showed she fit the profile of women who were treated at Poetic and she believed Z.T. would be successful in the program. Dr. Han did not know if Z.T. was "making up being trafficked" and she stated that such information was not relevant to Poetic's referral process.

Although Poetic was not "under the umbrella" of the Texas Juvenile Justice Department, Dr. Han said the organization had a memorandum of understanding with the Dallas County Juvenile Department. Poetic was not a locked facility but could provide services to Z.T., either in detention or upon release. Regardless of

whether Z.T. remained in the juvenile justice system or was transferred to criminal district court, Dr. Han stated Poetic's services would be available to Z.T.

Finally, the defense presented the testimony of Emily Chavez, program director at Valiant Hearts. Valiant Hearts works with women who have been sexually exploited by providing them with housing, support groups, case management, therapy, and mentoring. Chavez testified they would be able to place Z.T. in a "restoration home" and provide services such as addiction classes, therapy, and life skills training. Chavez noted their facilities were "highly structured," but they could not keep an adult from leaving. Chavez further testified that, in her experience, they had never worked with someone in the juvenile justice system and she had never worked with anyone who was found to have committed capital murder.

Following the hearing, the judge granted the State's motion, waived jurisdiction, and transferred Z.T.'s case to criminal district court. Among the findings set forth in the order, the court stated that, "after considering all the testimony, diagnostic study, social evaluation, and full investigation, the Court finds it is contrary to the best interest of the public to retain jurisdiction." The court found Z.T. was of sufficient sophistication and maturity to be tried as an adult and to aid her attorney in her defense. The court further found there was probable cause to believe Z.T. committed the offenses alleged and "for the welfare of the community,

the seriousness of the alleged offenses, and the background of [Z.T.]," criminal proceedings were required.

The court's order went on to list the following reasons for its disposition: (1) Z.T. is charged with violating penal laws of the grade of felony; (2) Z.T. was fourteen years or older at the time she is alleged to have committed the offenses; (3) no adjudication hearing has been conducted concerning the alleged offenses; (4) Z.T.'s conduct was willful and led to violence; (5) a deadly weapon, to wit: a firearm, was used during the course of the offenses; (6) personal injury resulted to Lobo and personal injury and death resulted to Murillo; (7) the offenses were so serious that transfer to a district court with criminal jurisdiction must be granted; (8) Z.T. has not accepted or responded to supervision; (9) Z.T. has a history of failing to accept and respond to supervision; (10) Z.T. has a pattern of refusing to remain at home; (11) Z.T. refuses to remain away from associates in the community who habitually violate the law; (12) Z.T.'s levels of sophistication and maturity were sufficient; (13) Z.T.'s background indicates that the welfare of the community requires criminal prosecution, (14) the circumstances of the offenses and Z.T.'s previous history indicate a present need for placement of the child in a controlled, structured facility; (15) the public needs protection from Z.T.; (16) the prospects of adequate protection of the public and the likelihood of rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court are remote; and (17)

it is desirable that all parties to the offenses be tried in one court since the accomplices are adults.

The specific factual findings made by the court were: (1) Z.T. had, as reported, a minimum of ten runaways; (2) Z.T. had been arrested for drugs in school and had numerous violations of the deferred prosecution program; (3) the present case did not allow for the procedures, services, and facilities available to the juvenile court which fell into the categories of programs, services, and placements provided by, operated by, or contracted for by the Dallas County Juvenile Department and disposition orders involving the Texas Juvenile department; (4) Valiant Hearts was not a service or placement available to the juvenile court based on the criteria set forth; (5) the services provided by Poetic would likely only be available as an interim or Release Order for the juvenile court; and (6) based on Z.T.'s age and the trajectory of the case, it was unlikely and improbable that the juvenile court would be able to conclude the case within the jurisdictional time frame of the law applicable to the court and, therefore, it was unlikely and improbable that the juvenile court could enter any disposition order, including commitment to the Texas Juvenile Justice Department, that would be appropriate, significant, meaningful, impactful, rehabilitative, or protective of Z.T. and the community.

The juvenile court signed its transfer order on February 18, 2021. Z.T. then brought this appeal.

**Analysis**

In her first issue, Z.T. contends the juvenile court erred because it "minimally identified evidence, collected through an inadequate investigation, to justify the waiver of jurisdiction." Relatedly, in her second issue, Z.T. contends the juvenile court erred in failing to include in the transfer order any discussion of the evidence that weighed against the transfer. And, in her fifth issue, Z.T. contends the court erred in refusing to admit critical evidence supporting her defensive theory. All three issues focus on whether the juvenile court considered all the evidence relevant to the transfer determination before making its decision.

## 1.  Specificity of Order

In both her first and second issue, Z.T. challenges the specificity of the juvenile court's order. Z.T. acknowledges the Texas Court of Criminal Appeals recently held that, while the juvenile court must state the reason or reasons for its decision to transfer a juvenile, it is unnecessary for the court to "show its work" by including case-specific findings in the transfer order. *See Ex Parte Thomas*, 623 S.W.3d 370, 383 (Tex. Crim. App. 2021). Although such findings may be helpful when reviewing the court's decision, the hearing itself prevents the transfer process from being arbitrary. *Id*. at 381. Where, as here, we have a record from the hearing, we may review the entire record to determine whether the facts elicited sufficiently support the juvenile court's stated reason or reasons for the transfer. *See Moon v.*

–20–

*State*, 451 S.W.3d 28, 54 (Tex. Crim. App. 2014) (Keller, P. J. dissenting) *overruled by Ex Parte Thomas*, 623 S.W.3d at 383.[1]

Section 54.02(a) of the Texas Family Code provides that, when a child is over the age of fourteen at the time they are alleged to have committed a capital felony or felony of the first degree, and under the age of eighteen at the time of the hearing, the child may be transferred to criminal district court if, after a full investigation and hearing, the juvenile court determines there is probable cause to believe the child committed the offense alleged and, because of either (1) the seriousness of the offense or (2) the background of the child, the welfare of the community requires criminal proceedings. TEX. FAM. CODE ANN. § 54.02(a). In making this determination, the court must consider, among other matters, the following four factors: (a) whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person; (b) the sophistication and maturity of the child; (c) the record and previous history of the child; and (d) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." *Id* § 54.02(f). The statute does not require the juvenile court to find any particular factor to be true. *Moon*, 451 S.W.3d at 54 (Keller, P. J., dissenting).

---

[1] In *Ex Parte Thomas*, the court of criminal appeals explicitly overruled *Moon v. State* and, in doing so, frequently cited with approval the dissent in *Moon* authored by Presiding Judge Keller. *See Ex parte Thomas,* 623 S.W.3d at 382. We, likewise, find Judge Keller's dissent instructive.

The factors are simply non-exclusive guides in deciding whether one or both of the two reasons for transfer exists. *Id.* The relevant question is whether the evidence considered by the juvenile court is sufficient to justify the transfer on the basis of either the seriousness of the offense or the background of the child. *Id.* at 55–56.

In its order, the juvenile court stated the transfer of Z.T. to criminal district court was necessary based on both the seriousness of the offenses and Z.T.'s background. The court further stated it had considered all the testimony, the diagnostic study, the social evaluation, and the full investigation in making its determination to transfer Z.T. While the transfer order does not discuss any of the mitigating evidence, it was not required to do so. *See Thomas*, 623 S.W.3d at 383; *see also In re J.R.*, No. 05-20-00920-CV, 2021 WL 777090, at *8 (Tex. App.— Dallas Mar. 1, 2021, pet. filed) (mem. op.). The court's statement setting forth the evidence and materials it relied upon, which included the evidence submitted by the defense, is sufficient by itself to indicate that it considered the mitigating evidence. *In re J.R.*, 2021 WL 777090, at *8. The court's consideration of mitigating evidence is further demonstrated by its refusal to exclude testimony concerning Z.T.'s alleged status as a victim of sex trafficking. The State objected to the admission of such evidence at the transfer hearing, arguing it was relevant only to a determination of Z.T.'s guilt or innocence and not whether Z.T. should stand trial as an adult. The court overruled the objection stating the evidence was relevant as a factor that may mitigate against transfer and admitted the testimony for that purpose. We conclude

the juvenile court did not err by failing to include a discussion of the mitigating evidence in its order. We overrule appellant's second issue.

## 2. <u>Adequacy of Investigation</u>

In her first issue, Z.T. additionally suggests the evidence was insufficient to support her transfer because Wright's investigation, and therefore the report upon which the court relied, was inadequate. Specifically, Z.T. contends Wright failed to conduct an independent investigation of allegations that Z.T. was abused by her father, the number of times Z.T. ran away from home, and Z.T.'s claim that she was a victim of sex trafficking. The State responds that Z.T. failed to preserve this issue for review, prevented any investigation into the matters specified, and introduced sufficient evidence at the hearing to allow the juvenile court to fully consider those matters.

Although the family code requires a "full investigation" before a juvenile may be transferred, the code does not define the phrase "full investigation." *Turner v. State*, 796 S.W.2d 492, 497 (Tex. App.—Dallas 1990, no writ). The course and scope of an investigation will vary according to circumstances. *Id*. A juvenile may challenge the fullness of the investigation, but the initial determination of whether the investigation was sufficiently complete must be made by the court that ordered it. *Id*. Where the juvenile fails to raise an objection to the completeness of the investigation in a timely manner, the complaint is not preserved for appellate review.

*Pipkin v. State*, 329 S.W.3d 65, 68–69 (Tex. App.—Houston [14th Dist.] 2010, pet ref'd).

Z.T. concedes that no formal objection was made to the completeness of Wright's report. But Z.T. argues such an objection should not be required at a hearing in which the rules of evidence have traditionally been relaxed so as to determine the best interests of the child. *See In re J.R.C.*, 551 S.W.2d 748, 752 (Tex. App.—Texarkana 1977, writ ref's n.r.e.). The requirement that a party make a timely and specific objection alerting the trial court to potential error is not an evidentiary matter, however. It is a matter of error preservation and allowing the trial court to make a determination in the first instance. *See* TEX. R. APP. P. 33.1; *see also Pipkin*, 329 S.W.3d at 69. With few exceptions, a party cannot complain about an error it did not give the trial court an opportunity to correct. *See* TEX. R. APP. P. 33.1 Requiring the defense to inform the juvenile court that additional investigation is necessary before the transfer decision can be made properly serves the best interests of the juvenile by not forcing the child to wait until the appellate process is finished for a determination that more information was needed.

Z.T. next argues the inadequacy of Wright's report was made abundantly clear to the juvenile court through defense counsel's cross-examination of Wright. With respect to Wright's investigation into alleged abuse of Z.T. by her father, Z.T. points to the following question and response:

Defense counsel: So the parent and/or child reported things one way. When actually there were other things going on with that child in the home?

Wright: It appears so, yes. It appears from today's testimony, yes.

Immediately preceding this exchange was testimony by Wright concerning complaints made by Z.T.'s parents about Baldenegro and another man with whom Z.T. had a relationship. Even assuming this question and response could be read to refer to discipline by Z.T.'s father, it does not demonstrate that Wright failed to properly investigate the matter, but rather that Z.T. and her family failed to cooperate with the investigation.

The evidence shows that Wright specifically asked Z.T. and her parents whether Z.T. had ever been physically, sexually, or emotionally abused and they all responded "no." Z.T. actually stressed to both Wright and Dr. Hinton how supportive her parents were and how strong a relationship she had with each of them. Although Detective Stelter testified that incidences of Z.T. running away from home were often precipitated by her father trying to discipline her, he further testified that an investigation determined the father's discipline was reasonable. Dr. Hinton testified she asked Z.T. about an allegation she made that her father was abusive and Z.T. was advised by counsel not to respond. A decision not to cooperate with the investigation cannot serve to provide Z.T. with grounds for reversal based on the inadequacy of the investigation. *See Ortega v. State*, No. 05-00-00086-CR, 2002

WL 14163, at *3 (Tex. App.—Dallas 2002, pet. ref'd) (not designated for publication).

Relying on *Estelle v. Smith*, 451 U.S. 454, 469–71 (1981) and *In re J.S.S.*, 20 S.W.3d 837, 846 (Tex. App.—El Paso 2000, pet. denied), Z.T. argues that, based on her rights under the Fifth Amendment to the United States Constitution, she could not be compelled to respond to questions regarding her past. But Z.T. was not compelled to answer questions and her right to remain silent, assuming it applied, was never violated. What Z.T. failed to demonstrate to the juvenile court, and fails to explain on appeal, is what additional information, if any, Wright could have uncovered about alleged abuse in the home given Z.T.'s unwillingness to answer questions.

Z.T. suggests that Wright could have obtained information from Child Protective Services or the Grand Prairie Police Department about prior abuse. In support of this, Z.T. cites the sex trafficking referral form in which it was indicated that Z.T. had a "history of DFPS/CPS involvement" and that she had previously reported abuse by her father. According to Dr. Hinton, however, the referral form was "based on a self-report from the juvenile" and Z.T. later denied any CPS involvement with her family. Detective Stelter testified the only investigation by the GPPD into discipline of Z.T. by her father showed it was reasonable. There is nothing in the record to show that either CPS or the GPPD had any information about

alleged abuse of Z.T. by her father other than what was disclosed at the hearing and in the reports filed with the court.

Z.T. contends the inadequacy of Wright's report was also made apparent when defense counsel noted the report referenced only two episodes of Z.T. running away from home in contrast with police records that indicated there were at least ten reported incidences of Z.T. running away. Wright admitted at the hearing that her report appeared to be inaccurate with respect to the number of times Z.T. ran away from home, but she explained it was based on the number of incidences reported to her by Z.T. Accordingly, the inaccuracy in Wright's report was caused by Z.T.'s own actions. Again, Z.T. cannot fail to cooperate with the investigation and then complain about inadequacies of her own making. *See Ortega*, 2002 WL 14163, at * 3. In addition, the juvenile court was made fully aware of the number of times Z.T. had run away from home and included this information in its order. Its ruling, therefore, was based on accurate information.

Finally, Z.T. contends that Wright admitted at the hearing that she failed to investigate Z.T.'s allegations of sex trafficking despite knowing that the allegations had been made. The record does not support this assertion. Wright's testimony was that, several months before she interviewed Z.T., she became aware of reports in the media that Z.T. was claiming to have been sex trafficked. When Wright later questioned Z.T. and her family, they denied any abuse had occurred. Wright stated that, because Z.T. denied the abuse allegations, and neither Z.T. nor her parents

disclosed any information to her about the alleged sex trafficking, she could not take any further steps. When Z.T. was subsequently questioned by both Dr. Hinton and the police child exploitation unit about her allegations of sex trafficking, she was advised by attorneys not to respond.

Z.T. suggests that Wright could have obtained "extensive evidence" elsewhere of her being sex trafficked. But, again, Z.T. fails to explain what more Wright could have, or should have, done given that, after her outcry, Z.T. and her parents denied to Wright that any abuse had occurred. According to Charleston, Z.T.'s case advocate, the only evidence that Z.T. was sex trafficked, other than Z.T.'s own statements and statements by her parents, were the text messages between her and Baldenegro and the circumstances of the offenses with which Z.T. was charged. Wright was fully aware of this evidence at the time she filed her report.

To the extent Z.T. complains that the juvenile court's ruling is erroneous because it relied on a report that does not discuss Z.T.'s allegations of sex trafficking, it is clear that the court allowed and considered evidence that Z.T. was sex trafficked before rendering its decision. As discussed above, it was not necessary for the juvenile court to specifically acknowledge this evidence in its order. *See Thomas*, 623 S.W.3d at 383; *In re J.R.*, 2021 WL 777090, at \*8. Although Z.T. argues the evidence that she was a sex-trafficking victim was compelling, there was also compelling evidence that she was a willing and complicit party to the offenses with which she was charged. Based upon the record before us, we cannot conclude the

juvenile court erred in failing to require additional investigation before rendering its decision. We overrule Z.T.'s first issue.

### 3. __Exclusion of Evidence__

In her fifth issue, Z.T. argues the juvenile court's refusal to admit certain pieces of critical evidence showing that she had been sex trafficked prevented the defense from establishing its theory of the case and "impeded the Court's ability to fairly evaluate [Z.T.'s] place in the justice system." The three pieces of evidence about which Z.T. complains are (1) an email chain demonstrating the receipt of Z.T.'s sex trafficking referral form by the juvenile department, (2) the photograph found on Z.T.'s phone of a girl with a caption over her face and the barrel of a gun pointed at her head, and (3) Z.T.'s affidavit alleging that she was sex trafficked by Baldenegro. All three pieces of evidence were excluded on the basis that they were not properly authenticated. With respect to all three pieces of evidence, we conclude that any error by the juvenile court in refusing to admit them was harmless because substantively identical evidence was admitted through witness testimony.

The requirements governing an appeal of a juvenile transfer order are the same as in civil cases generally. *See* TEX. FAM. CODE ANN. § 56.01. To reverse a judgment in a civil case based on error in an evidentiary ruling, an appellant is required to establish not only that the trial court erred, but that the error probably caused the rendition of an improper judgment or prevented proper presentation of the case on appeal. *See* TEX. R. APP. P. 44.1(a). Where physical evidence is merely

cumulative of the testimony provided by the witnesses, any error in excluding the physical evidence is generally harmless. *See Cent. Forest S/C Partners, Ltd. v. Mundo-Mundo, Inc.*, 184 S.W.3d 296, 302 (Tex. App.—Dallas 2005, no pet.).

According to Z.T., the email chain she sought to introduce would have established that she was referred to the juvenile department as a victim of sex trafficking. Multiple witnesses testified about the referral, however, and the referral form itself was admitted into evidence. Z.T. does not explain what more the email chain transmitting the form would have added to what was already in evidence before the court.

There was also extensive testimony about the picture found on Z.T.'s phone. Z.T. contends that admission of the picture would have demonstrated that her actions in connection with the charged offenses were coerced rather than willful. Detective Stelter testified the photograph depicted what appeared to be a shotgun held to a girl's head and the photo had a caption across it. He further stated that the photograph could be a screen shot from social media and there was no indication of when the picture was taken or who was holding the gun. The detective could not positively identify Z.T. as the subject of the photo due to the caption across the subject's face and the quality of the picture. He further testified that there were multiple "selfies" found on Z.T.'s phone of her posing with firearms, and video found in proximity to the picture at issue demonstrated Z.T. "practicing a concerned look," which suggested the photograph was a social media stunt.

In Z.T.'s offer of proof for the photograph, Charleston testified that the picture depicted Z.T. "with a horrified look on her face and a shotgun pointed directly at her head." But Z.T. offered no evidence regarding when the picture was taken, the context in which it was taken, or who was holding the gun. Charleston testified at length that Z.T.'s actions on the day of the offenses were a result of her fear that Baldenegro would hurt her or her family if she did not comply with his demands. We cannot conclude the exclusion of the picture, described in detail through the testimony of witnesses, and that may or may not have supported the defense's theory of the case, prevented the juvenile court from fairly evaluating the evidence.

Lastly, Z.T. contends that if the juvenile court had admitted her affidavit describing the abuse inflicted on her by Baldenegro, "a more accurate conclusion would have been reached." But Charleston testified in detail about Z.T.'s abuse allegations, including that Baldenegro raped Z.T. and trafficked her to other men. Charleston stated Z.T. told her she was terrified of Baldenegro and that he kept her high on drugs. Charleston further testified that, in her opinion, Z.T.'s actions on the day of the offenses were the result of her fear of Baldenegro. The juvenile court specifically stated it would consider Charleston's testimony about Z.T.'s allegations of sex trafficking in making its transfer decision. The allegations made in the affidavit were essentially cumulative of the information conveyed by Charleston. Accordingly, there is no indication the court failed to consider this evidence, or that the decision would have been different if Z.T.'s affidavit had been admitted.

Similarly, there is no indication that the juvenile court failed to consider any of the other mitigating evidence relied upon by Z.T. Z.T. points to evidence of her "exemplary" conduct following her arrest for the offenses at issue. This evidence had to be weighed against Z.T.'s previous history of resisting discipline and her failure to comply with court ordered requirements while on probation for a drug offense. Z.T. relies on test results indicating she scored below average on an intelligence test. But this had to be weighed against her significantly higher score on a previous test and her ability to maintain As and Bs in school while taking advanced placement classes at an age appropriate grade level. And Z.T.'s reported resilience and ability to adapt had to be weighed against her reported lack of motivation to change because she is pleased with who she is. There is nothing in the record to suggest the juvenile court did not weigh all the competing evidence in reaching its decision. *See Leno v. State*, 934 S.W.2d 421, 422–23 (Tex. App.—Waco 1996, pet. dism'd) (where record from hearing contains evidence of Z.T.'s age, failure of juvenile court to specify age in order does not indicate court failed to consider it). In sum, Z.T. has not shown reversible error in the trial court's rulings to exclude the email chain, photograph, and her affidavit given that substantial evidence was admitted on each of these items during the trial. Accordingly, we overrule the fifth issue.

## 4. **Z.T.'s Age as a Factor**

In her third issue, Z.T. contends the juvenile court erroneously considered the fact that she was nearly eighteen years old at the time of the hearing in its decision to transfer her to criminal district court. Z.T. argues her age was solely a jurisdictional matter and not relevant to any of the statutory factors the court must consider in making the transfer determination. We disagree.

It is undisputed that the four factors listed in section 54.02(f) of the family code are not exclusive. *See Thomas*, 623 S.W.3d at 382. Although the age of the child is a threshold matter in the transfer process because the factors listed in section 54.02(f) apply only to juveniles under the age of eighteen, nothing in the statute prohibits the juvenile court from considering the child's age, along with other relevant information, when making its transfer determination. *See* TEX. FAM. CODE ANN. § 54.02(f),(j); *see also, In re L.W.*, No. 05-19-00966-CV, 2020 WL 728431, at *12 (Tex. App.—Dallas Feb. 13, 2020, no pet). The age of the child at the time of the hearing is particularly relevant to the fourth factor – "the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court." *See In re L.W.*, 202 WL 728431, at *12. This is because the resources of the juvenile court are designed to assist and rehabilitate juveniles, not adults. *See In re H.Y.*, 512 S.W.3d 467, 478 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). In its order, the juvenile court stated it had specifically considered the "procedures, services, and facilities" available to it, as well as the

–33–

placements and resources for rehabilitation suggested by the defense, and concluded none of them were appropriate for Z.T.

In addition, the juvenile court loses jurisdiction over the child once she reaches the age of nineteen. *See* TEX. HUM. RES. CODE ANN. § 245.151. In its order, the juvenile court specifically found Z.T.'s age was relevant to its decision because, based on her age and the nature of the case, it was "unlikely and improbable" that the court would be able to conclude the case "within the jurisdictional time frame" and, therefore, also "unlikely and improbable" that it could enter any disposition order, including commitment to the Texas Juvenile Justice Department, that would be "appropriate, significant, meaningful, impactful, rehabilitative, or protective of [Z.T.] and the community." Whether the juvenile court would have sufficient time to rehabilitate the child before it loses jurisdiction is a proper consideration. *See In re L.W.*, 202 WL 728431, at *12. The language of section 54.02 does not dictate otherwise.

Z.T. argues that allowing the juvenile court to consider the age of the child in its transfer decision would encourage the State to delay proceedings and wait until "the last jurisdictional moment" to seek a transfer. Z.T. contends this tactic would result is essentially automatic transfers of all juveniles above a certain age. But, while the age of the juvenile is relevant, it is far from determinative. Every case turns on its own facts. Indeed, the court could find that the likelihood of rehabilitation in the juvenile system weighed in favor of transfer, and still decide to

retain jurisdiction. The statute requires only that the court consider the factors listed; it does not mandate that any particular factor be true, or limit the purpose for which the factors may be considered. *Thomas*, 623 S.W.3d at 382. The court is also not required to give each of the factors equal weight. *See In re J.J.*, 916 S.W.2d 532, 535 (Tex. App.—Dallas 1995, no writ). Accordingly, the consideration of age is not, as Z.T. suggests, dispositive. We resolve Z.T.'s third issue against her.

## 5. <u>Sophistication and Maturity</u>

In her fourth issue, Z.T. contends the juvenile court erred in its "reliance upon boilerplate language with respect to the sophistication and maturity element." Z.T. argues the court's order should have specifically addressed whether she was "criminally sophisticated." She further argues that, based on numerous studies showing that adolescents generally do not have the same capacity as adults to appreciate the long-term consequences of their decisions and are easily influenced by their peers, the fact that the court found her to be of sufficient sophistication and maturity "for her age" should weigh against her transfer.

In its order, the juvenile court stated it found Z.T. was of sufficient sophistication and maturity to be tried as an adult and to assist her attorney in her defense. To the extent Z.T. again contends the court should have included more specific findings in its order, the court of criminal appeals has already ruled that such specificity is not required. *See Thomas*, 623 S.W.3d at 383. It was not necessary for the court to make any affirmative finding on sophistication and maturity to

–35–

support Z.T.'s transfer. *In re C.C.*, 930 S.W.2d 929, 933–34 (Tex. App.—Austin 1996, no writ).

In assessing maturity and sophistication, courts place weight on whether there is evidence indicating the juvenile knew right from wrong. *In re K.J.*, 493 S.W.3d 140, 151 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Evidence that a juvenile attempts to conceal participation in a crime demonstrates both sophistication and maturity as well as culpability. *In re J.R.*, 2021 WL 777090, at *9. In this case, there was testimony that Z.T. advised those with whom she was planning criminal acts to "say less" in their text messages, indicating she was aware of the wrongfulness of her actions and did not want to create incriminating evidence. While there is no requirement that the juvenile court specifically find a child is "criminally sophisticated" before ordering a transfer, evidence that a juvenile is trying to avoid creating incriminating evidence would tend to show that type of sophistication.

As for Z.T.'s argument that a finding of average sophistication and maturity should weigh against a transfer, Texas courts have consistently held that not every factor must weigh in favor of transfer to justify the juvenile court's decision. *See e.g., In re K.J.*, 493 S.W.3d at 152. Furthermore, because the statute authorizes the transfer of juveniles as young as fourteen years of age, nothing in the statute can be read to suggest that a finding that Z.T. had a level of sophistication and maturity on par with other seventeen year-olds should weigh against transfer. *See In re E.D.N.*,

635 S.W.2d 798, 801 (Tex. App.—Corpus Christi–Edinburgh 1982, no writ). We resolve Z.T.'s fourth issue against her.

## Conclusion

Juvenile courts have substantial discretion in making the transfer decision. *Thomas*, 623 S.W.3d at 380. We cannot substitute our interpretation of the evidence for that of the factfinder even if a different decision could be reached. *In re J.J.*, 916 S.W.2d at 536. The evidence before the juvenile court here showed that Z.T. took part in a pre-meditated plan to assault and rob two men that resulted in the death of one of the victims. After the offenses were committed, Z.T. did not appear to show any concern or remorse. The evidence further showed that Z.T.'s history of running away and engaging in criminal activity pre-dated her relationship with Baldenegro and she planned similar criminal activities with a female friend. Messages found on Z.T.'s phone indicated she was comfortable with violence and had threatened deadly action against a person she perceived as having wronged her and her family. Z.T. also had a lengthy record of resisting previous attempts by her parents and the court to discipline her.

The juvenile court's decision to transfer Z.T. to criminal district court is not an adjudication or conviction for the offenses she is alleged to have committed. *See In re J.G.*, 495 S.W.3d 354, 366 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Nor is it a determination that whatever defenses Z.T. may have to the allegations made against her are without merit. It is simply a determination that a criminal

district court is the more appropriate forum for the proceedings. *See In re D.M.*, 611 S.W.2d 880, 883 (Tex. App.—Amarillo 1980, no writ); *see also State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd) (court at transfer hearing does not consider guilt or innocence, but only whether juvenile's and society's best interests would be served by maintaining custody in juvenile system or by transfer to district court). Regardless of whether it is ultimately determined that Z.T. was a victim of sex trafficking, we cannot conclude the juvenile court abused its discretion in determining that it was appropriate to transfer Z.T.'s case to criminal district court based on both the seriousness of the offenses and Z.T.'s background.

We affirm the juvenile court's order.


/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE

210138F.P05



## Court of Appeals
## Fifth District of Texas at Dallas
## JUDGMENT

IN THE MATTER OF Z.T.

No. 05-21-00138-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas
Trial Court Cause No. JD-20-00919-X.
Opinion delivered by Justice Reichek. Justices Molberg and Nowell participating.

In accordance with this Court's opinion of this date, the juvenile court's Waiver of Jurisdiction and Order of Transfer to a Criminal District Court is **AFFIRMED**.

Judgment entered August 17, 2021